FRANK STEWART AND WILLIAM STEWART, *Plaintiffs in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

58    97
58    146

1. Where the evidence entirely fails to connect a convicted party with a crime of which he was convicted, this court will reverse the judgment of conviction.

2. It is competent for a party on trial for alleged crime, on the cross-examination of a State witness to propound to him questions tending to show the motives, interest or animus of the witness as connected with the cause of the parties thereto, and in this regard a wide range of cross-examination should be allowed.

3. A State witness cannot be cross-examined in regard to the contents of an affidavit he admits having made, until the affidavit has been exhibited to him.

4. Where a defendant on trial makes himself a witness in the case and is asked in cross-examination whether he had made a certain statement to another party, and where he admits having a conversation with said party, but denies that he made the statement about which he had been interrogated, he should be allowed on the re-direct examination to tell what the conversation was.

This case was decided by Division B.

Writ of Error to the Circuit Court for Lafayette County.

The facts in the case are stated in the opinion of the court.

*L. E. Roberson* and *A. L. Auvil,* for Plaintiffs in Error.

*Park Trammell,* Attorney General, for the State.

HOCKER, J.—The defendants in error were indicted in Lafayette County Circuit Court in November, 1908, for the murder of one Henry Chewning on July 18, of that year. Frank Stewart as principal and William Stewart as accessory, were tried and convicted of murder in the second degree and sentence of imprisonment for life was imposed upon each of them. They are here seeking a

reversal of the judgment below. We will endeavor to give as succinct a statement of the principal facts as can be gathered from a voluminous record containing the evidence as to its bearing upon the question of William Stewart's guilt. We make this statement principally from the testimony of Sam Clark,

It seems that Henry Chewning, the deceased, (otherwise known as Dick Chewning) had entered a homestead some time before he was killed and had moved from it and induced the defendant Frank Stewart to occupy the house upon the homestead land. It had been reported to Chewning that Frank Stewart would attempt to defeat him in perfecting his homestead claim, and Chewning had given him notice to vacate the homestead. On the Sunday before the killing Henry Chewning, Charles Hartman, Henry Croft, Fred Thomas and Sam Clark all met at Frank's house (the homestead) about 10 o'clock in the morning; Henry Chewning had spent the night there. Some of these men testified that they went there as witnesses for Chewning of a demand he was going to make of Frank Stewart for the possession of the house on the homestead. It seems that they all had some sort of a grievance against Frank Stewart. He was charged by one with having threatened to burn him out, and by others with having stated that they had been marking hogs which did not belong to them. Reading between the lines it is perfectly certain they were anxious for him to move. He promised Henry Chewning to move from the homestead on the following Friday. He seems to have been a very poor man, owning neither horse nor wagon. He seems to have made some sort of efforts to get a team to move his effects but failed. On Friday afternoon he put his goods in one room of the house, locked up the door, left the key where it was usually put, took his wife and children and went to his brother William Stewart's

. house, about two miles from the homestead.   Early next morning (Saturday) about eight o'clock Henry Chewning and Sam Clark (who was the uncle of Chewning) went to the homestead, found there the wives of Frank and William Stewart, and found the house locked up.   It does not appear that they asked Frank Stewart's wife for the key, but otherwise.   They found out from the Stewart women that Frank Stewart was at William Stewart's, and went on to the latter's house, a part of the time in company with the wives of the Stewarts, though they arrived a little before the mesdames Stewart.   Henry Chewning was armed with a six chambered revolver carried in a scabbard and Sam Clark with a Winchester rifle. They found Wm. Stewart plowing about 250 yards in the rear of his house and Frank Stewart pulling fodder about 150 yards in front of the house.   Sam Clark who is the only State witness to what occured when the killing took place, says that he and Chewning went there to get the keys to the homestead house.   Sam Clark leant his rifle against a tree in the yard and Henry Chewning went out into the field where Frank Stewart was at work.   As to what was said in the field there is no witness except Frank Stewart who says that Chewning used threatening language to him with his pistol in his hand, unless he took immediate steps to move his effects out of the homestead house.   Chewning and Frank Stewart came to the house together.   Frank was at that time unarmed.   They stepped up on the porch in front of the house upon one end of which Sam Clark was sitting.   The women and five or six children also seem to have been on the porch; Mrs. William Stewart, apprehending some trouble, as she says, sent one of the little girls for her husband.   Sam Clark says that Henry Chewning asked that he be sent for, to make some arrangements for moving Frank's effects.   Sam Clark says that when William came up he got

a chair and sat down on the porch, right facing him; that he was leaning against a post; that William was in his shirt sleeves; that he had no weapon of any kind that he saw. Clark says that Frank said, "William, what will be the chances to get your horse to-day to move my things from Dick's (Henry Chewning's) homestead down there and put them in your crib. Dick told me he had gone up there today with his shooting clothes on and I want to move my things down here." Clark says, "William told him he could not get the horse, and he said, Henry Chewning, I do not allow you to come here and try to bulldose Frank at my house, and by God you cant bulldose me." As he said this he stepped right off the edge of the shed on the ground and went right by my feet, and went round, and stepped up into the shed right facing Dick. I did not look around until he stepped up on the floor, and while he was going from where he got out I suppose—anyhow when I looked around Frank was coming from towards the door with his gun and William stepped right up in Dick's face so close Dick had no chance to do anything but go right backwards and step off of the floor to the ground, and just as he stepped off on the ground Frank Stewart cocked the right hand barrel of his gun and pulled it in shooting position at Dick just as he threw it at him first he said 'now God damn you, die.' "

Q. Did he shoot at that time? A. No, sir. William got between the muzzle of the gun and Dick so close up that— Q. Just describe the course that was taken by these three men from that time on. A. Dick commenced going backwards with William and walked right on around the oak here, and Frank stepped out with the gun in his hand. He lowered the gun, and right where that is, he stepped behind William and walked so close behind William until he got to where my gun had been lying against one of the oaks here and when he got right there

Frank stopped. Q. Where was Dick then? A. Backing right on with William. He got right here to where the trails come together. William walked so close up to him that Dick had no room to do anything but walk right backward. Q. You say that Dick was walking, and that William was following until they got to the point of the trail, now what became of William at that time? A. He looked back over his shoulder to where I was sitting and then backed right off from Dick, and when he got three or four steps, I do not know exactly how far, it was the first time he had given Dick a chance, and I thought Dick would draw his pistol and I was watching Dick when William shot me.

This witness then goes on to describe the situation of the wives of the Stewarts, their children and his own, on the porch. He then testified as follows: Q. Now you say at the time you were shot William was looking at Dick. A. Yes, sir. This witness then says he was shot in two places while leaning against the post. One shot striking him on the side of the head and the other penetrating his thigh. He was rendered unconscious for a few moments and when he recovered consciousness William Stewart came to him and told him that Frank had shot Dick and killed him, and that Dick's shooting at Frank had hit the witness twice. William then told the witness he had better go in where he could lie down on the bed, and witness told him it would not do as he was bloody all over. William helped him up, assisted him into the house and put some linament on his wounds. This witness also states that though he was looking at William he did not see him have a gun; that he did not hear any shot at all from any source—as he became unconscious when he was shot. He did not see William with any weapon of any sort, though he must undoubtedly have had one. This witness' testimony occupies more

than thirty pages of the record, but we have given those parts bearing on William Stewart's connection with the killing of Henry (Dick) Chewning. All the other witnesses testified that Will Stewart had no weapon, and it does not appear that he was in any way concerned in the various quarrels between Sam Clark, Henry Chewning and other witnesses introduced by the State. His conduct at the time of the killing was perfectly consistent with that of a man who was seeking to prevent a conflict between his brother and Henry Chewning. Two bullets appear to have been discharged from Henry Chewning's pistol and it is not inconsistent with the evidence that the bullets from his pistol struck Sam Clark. He seems to suppose that he was shot by William but there is no proof at all that his supposition was correct. There is not a particle of testimony to the effect that William in any way suggested to Frank to get his gun, or that he shoot Henry Chewning. The only thing he did was to express his disapproval of the apparent bulldozing of his brother. We find nothing in this testimony to warrant the conviction of William Stewart of complicity in the killing of Henry Chewning. Henry Chewning was evidently killed by Frank Stewart, and in view of our conclusions upon the other phases of the case we express no opinion as to the bearing of the evidence as to him.

The first assignment of error questions the ruling of the court in admitting a map or diagram of William Stewart's house and premises. We have been unable to find the map in the record and we deem it unnecessary to notice this assignment.

Several assignments of error are based on the action of the court in overruling several questions propounded to the State's witness Sam Clark, in which in various forms he was asked in effect whether he was not at Frank Stewart's house on the Sunday previous to the killing of Henry

Chewning in company with Charles Hartiman and others and whether the witness did not then say to Frank Stewart he must leave there by the following Friday afternoon, or that they would hunt him up and kill him. We think the court erred in refusing to permit these questions to be propounded.

In the case of Wallace v. State, 41 Fla. 547, 26 South. Rep. 713, it is held that for the purpose of discrediting a witness a wide range of cross-examination is permitted, as *a matter of right* in regard to his motives, interest or animus, as connected with the cause or the parties thereto, upon which matter she may be contradicted by other evidence. Fields v. State, 46 Fla. 84, 35 South. Rep. 185; Driggers v. State, 38 Fla. 7, 20 South. Rep. 758; Selph v. State, 22 Fla. 537. We know of no law which forbids the proving of threats or threatening language made by a State witness in the case against the defendant. If he used such language it would indicate his animus.

An assignment of error is based on the refusal of the court to permit counsel for the defendants to ask the State's witness Sam Clark the following question: "Did you not on the 21st day of July, 1908, at your home in Lafayette County, Florida, make an affidavit before T. F. Bryan, as Notary Public, in relation to this homicide in which you stated that on the day of the homicide, when you regained consciousness Frank and William Stewart had both absented themselves?"

The witness had admitted making an affidavit before Mr. Bryan on the 21st day of July, 1908, but it does not appear that he was shown the affidavit or that his attention was called to the statements therein which were contradictory of his statement on the trial. We cannot say the court erred in its ruling as the affidavit does not appear to have been exhibited to the witness. Simmons v. State, 32 Fla. 387, 13 South. Rep. 896. The affidavit, how-

ever, was by order of the court copied into the record, for what purpose is not indicated; but it appears the witness had stated therein that when he regained consciousness William had absented himself—a statement inconsistent with his testimony on the trial.

Frank Stewart, while on the stand as witness, was asked on cross-examination whether on the Sunday following the killing of Chewning he had not made a certain statement to one Hannibal Locke about the killing. He admitted a conversation with Locke but denied making that statement. On the redirect he was asked by his own counsel whether he had any talk with Hannibal Locke on the occasion referred to, and what that conversation was. The State Attorney objected to this question "unless it comes right along in a line for impeachment here." The court sustained the objection. Under the circumstances it seems to us that the defendant should have been allowed to give his own version of the conversation with Locke. We are unable to see the force of the objection.

The last assignment of error is based on the action of the court in overruling the motion for a new trial, wherein it was contended that the verdict was against the evidence. Our views of the evidence as to William Stewart have already been stated. In view of our rulings upon other matters we think it unnecessary to pass on this assignment as to Frank Stewart. Other assignments are argued but we are of opinion it is not essential that they should be considered by us.

The judgements of the court below as to the plaintiffs in error are reversed, and the case remanded.

TAYLOR and PARKHILL, JJ., concur;

WHITFIELD, C. J., and SHACKLEFORD and COCKRELL, JJ.. concur in the opinion.