776 So.2d 1073 (2001)
J. Clifton LINGLE, M.D., Appellant,
v.
Richard DION, Florida Center for Cosmetic Surgery, Inc., a/k/a, The Florida Center for Cosmetic Surgery, Inc., Appellees.
No. 4D00-348.
District Court of Appeal of Florida, Fourth District.
February 7, 2001.
*1074 Christopher A. Grillo of Law Offices of Christopher A. Grillo, P.A., Fort Lauderdale, for appellant.
David L. Kahn of David L. Kahn, P.A., Fort Lauderdale, for Appellee-Richard Dion.
LABARGA, JORGE, Associate Judge.
Richard J. Dion ("Dion") filed this medical malpractice action against J. Clifton Lingle, M.D. ("Lingle") and Lingle's employer, The Florida Center for Cosmetic Surgery, Inc. ("Center"), alleging that Lingle was negligent in performing surgery on Dion for the bilateral implantation of artificial pectoral muscles. A jury trial resulted in a verdict and final judgment in favor of Dion. Following the denial of his motion for new trial, Lingle filed a timely appeal.
Although Lingle raises a number of issues in his appeal, we find merit only in his arguments that the trial court erred in permitting testimony to be presented concerning Lingle's peer review process, and that the trial court erred in instructing the jury that the lack of staff privileges was negligence per se. Thus, we reverse and remand for a new trial.
*1075 According to the testimony presented, Lingle agreed to perform surgery on Dion for the bilateral implantation of artificial pectoral muscles. Due to complications with the initial procedure, Lingle performed two additional surgical procedures on Dion, the last of which left him with cuts under his arms and what he described as "slashes" all over his chest. Ultimately, Dion had the implants removed by a physician in Rhode Island; however, he is still experiencing pain and numbness in his left breast, and has not been able to work since the implants were removed.
During the trial, in response to Dion's amended complaint for punitive damages, Lingle, who was a pro se litigant, filed a Motion in Limine asking the trial court to exclude testimony or evidence pertaining to his lack of hospital staff privileges or transfer agreements. The motion was denied. Thereafter, Dion called Lingle as a witness and the following exchange took place:
Q. Doctor, has your license to practice medicine ever been suspended?
A. That's not a subject for discussion in this court.
Q. Are you refusing to
A. Yes.
The trial court directed Lingle to answer the question, and the following questioning continued:
A. Yes.
Q. On how many occasions, sir?
A. Once.
Q. Doctor, have you ever been placed on supervisory or monitor status by any medical board of any state?
A. Yes.
Q. On how many occasions?
A. Once.
Q. What state was that?
A. Florida.
Q. Were you placed on supervisory or monitor status in the state of Kentucky as well sir?
A. No.
Q. What is the current status of your medical license, Dr. Lingle?
A. I have a full active license.
Q. You have any probation of your license?
A. Yes.
Q. What is the probation, sir?
A. Two years.
Q. Is that probation and the previous suspension of your license directly related to care that you provided to patients while you operated a medical office in Florida Center for Cosmetic Surgery in the year 1996?
Lingle repeatedly objected to this line of questioning citing the language in § 766.101(5), Fla. Stat. (2000). Section 766.101(5), Florida Statutes (2000), states, in relevant part,
The investigations, proceedings, and records of a committee as described in the preceding subsections shall not be subject to discovery or introduction into evidence in any civil or administrative action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions of such committee or any members thereof.
Unfortunately, the trial court did not have the benefit of our recent decision in Liberty Mutual Insurance Co. v. Wolfson, 773 So.2d 1272 (Fla. 4th DCA 2000), at the time of its ruling in the instant action. In Wolfson, the defense counsel was permitted to ask one of plaintiffs treating physicians whether it was true that his privileges at a hospital had been suspended, and about the peer review process that resulted in that suspension. We found *1076 that line of questioning to be error, not only because such was an improper attack on the physician's credibility, see Tormey v. Trout, 748 So.2d 303 (Fla. 4th DCA 1999), but also because information about the peer review process is privileged under § 766.101(5).
In addressing the question of the privilege set forth in § 766.101(5), we noted in Liberty Mutual,
The peer review process is a system designed to keep health care costs low by encouraging self-regulation in the medical profession. See Holly v. Auld, 450 So.2d 217, 220 (Fla.1984). A limited guarantee of confidentiality for the information gathered during a peer review is necessary to ensure meaningful review. Id. at 220. To that end, the discovery privilege provided in the statute applies not only to medical malpractice actions, but also to "defamation actions arising out of the matters which are the subject of evaluation and review by hospital credential committees." Id. at 221; see also Bayfront Med. Ctr., Inc. v. State, Agency for Healthcare Admin., 741 So.2d 1226, 1228 (Fla. 2d DCA 1999)(The privilege and confidentiality of "peer review" records have consistently been construed broadly to protect the integrity of the "peer review" process).
In fact, the privilege protects not only documents created by a committee, but also any document considered by the committee in its decision making process. See Cruger v. Love, 599 So.2d 111 (Fla.1992); see also Munroe Reg'l Med. Ctr., Inc. v. Rountree, 721 So.2d 1220 (Fla. 5th DCA 1998)(The privilege extends to questions asked during a deposition regarding the temporary suspension of a physician's medical license during a peer review process).
Similarly, in the instant case, it was error for the trial court to require Lingle to testify about the suspension of his medical license and to require him to answer questions about the peer review process that led to that suspension. Such information was clearly privileged pursuant to section 766.101(5).
Lingle also asserts that the trial court erred in instructing the jury that his lack of hospital staff privileges was negligence per se. We agree.
The trial court essentially instructed the jury that, pursuant to Florida law, a physician who performs surgery which requires a general anesthetic "must have staff privileges to perform the same procedure as that being performed in the outpatient setting at a licensed hospital within reasonable proximity." The court further instructed the jury that a violation of this rule constituted negligence.[1]
*1077 "Violations of statutes [or ordinances], other than those imposing a form of strict liability, may be either negligence per se or evidence of negligence." deJesus v. Seaboard Coast Line R.R. Co., 281 So.2d 198 (Fla.1973) (emphasis omitted). "A cause of action in negligence per se is created when a penal statute is designed to protect a class of persons, of which the plaintiff is a member, against a particular type of harm." Newsome v. Haffner, 710 So.2d 184, 186 (Fla. 1st DCA), rev. denied, 722 So.2d 193 (Fla.1998). Violation of a statute, code, or ordinance which is designed to protect the general public, and not a particular class of persons, constitutes evidence of negligence and not negligence per se. See Lindsey v. Bill Arflin Bonding Agency, Inc., 645 So.2d 565, 567 (Fla. 1st DCA 1994).
In Borrego v. Agency for Health Care Administration, 675 So.2d 666 (Fla. 1st DCA 1996), the court considered whether double jeopardy protections precluded the criminal prosecution of a physician who had already been fined and suspended for violations of section 458.331, Florida Statutes. In analyzing the issue, the court first looked to whether section 458.331 was penal or remedial in nature, and concluded that although a proceeding to suspend or revoke a license is penal in nature, its goal is remedial. Id. at 668. A license revocation or suspension serves the purpose of protecting the public from unfit physicians rather than punishing the individual doctor. Id. Section 458.331, specifically, was designed to "protect the public from practitioners who cannot comply with `minimum requirements for safe practice.'" Id.; see also Boedy v. Dep't of Prof'l Regulation, 463 So.2d 215 (Fla.1985)(for purposes of the Fifth Amendment protection against self incrimination, section 458.331, is not penal in character, but merely seeks to determine "whether `petitioner is able to practice medicine with reasonable skill and safety'") (citation omitted).
The first paragraph of the jury instruction in question references section 458.331, which is entitled "Grounds for disciplinary action; action by the board and department." This statute merely describes actions on the part of a physician which would result in disciplinary proceedings. It does not expressly give a cause of action to patients who may have been injured by any of the actions described; as such, section 458.331 is not a negligence per se statute. The remaining language concerning office surgery and hospital staff privileges is derived from section 59R-9.009 of the Florida Administrative Code. That section prescribes the standards of practice for medical doctors, specifically, the standard of care for office surgery. Title 59 of the Florida Administrative Code is consistent with section 458.331, Florida Statutes, in that it regulates the medical practice and provides for disciplinary actions, but does not purport to give any protections to any particular class of people beyond the public at large. As such, a violation of section 59R-9.009 likewise could not be construed to constitute negligence per se. The trial court erred in instructing the jury that Lingle's failure to maintain hospital staff privileges constituted negligence per se.
Finally, given the fact that this case has been remanded for a new trial, we feel compelled to point out certain unprofessional conduct on the part of Dion's counsel which, we hope, will not be repeated during the retrial of this case or during the trial of any other case. During closing argument, Lingle said that the photographs which Dion submitted were not pictures of Dion, but of someone else. At the end of his closing argument, Lingle analogized this lawsuit to a football game, *1078 saying that he was the punter who kicked the football between the uprights, but the football later sues him claiming that he kicked the football too hard, bruising it and making it burst open at the seams. In response, Dion's counsel made the following remarks during his closing argument:
There was [sic] some photographs that were passed to the jury. First of all, the story about the football is about the dumbest story I've ever heard in a courthouse in front of a jury of intelligent people, but the most outrageous thing that I've heard today from Dr. Lingle in his summation is his argument to you that this isn't Rick Dion. He's staking his case on the fact that this is somebody else. Now, about this photo for a minute, because I'm going to show you what real B.S. is from this defendant. Real B.S.
An attorney's expression of his personal opinion as to the credibility of a witness, or his personal knowledge of facts, is entirely improper. "While an attorney is given broad latitude in closing argument, his remarks must be confined to the evidence, the issues and inferences that can be drawn from the evidence." Airport Rent-A-Car, Inc. v. Lewis, 701 So.2d 893, 896 (Fla. 4th DCA 1997). In addition, the repeated use of the term "B.S." was not only clearly improper, but also highly unprofessional. See Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010 (Fla.2000)(repeated use of the term "B.S. detector" was improper).
Counsel is reminded that the "privilege to practice law requires attorneys to conduct themselves in a manner compatible with the administration of justice. While counsel does have an obligation to be faithful to [his] [client's] lawful objectives, that obligation cannot be used to justify unprofessional conduct by elevating the perceived duty of zealous representation over all other duties." Visoly v. Sec. Pac. Credit Corp., 768 So.2d 482, 492 (Fla. 3d DCA 2000). All litigants, whether represented by an attorney or proceeding prose, are afforded equal access to the courts, and are entitled to a just and fair proceeding no matter how adversarial it may become. We trust that during the retrial of this case, counsel will refrain from expressing his personal opinion about the arguments presented by his opposition, will refrain from the use of expletives in describing his opposition's argument, and will avoid any other such unprofessional conduct.
REVERSED AND REMANDED FOR A NEW TRIAL.
STEVENSON and GROSS, JJ., concur.
NOTES
[1] The entire instruction given to the jury was as follows:

59R-9.009 Standard of Care for Office Surgery.
The Board of Medicine interprets the standard of care requirement of Section 458.331(1)(t), Florida Statutes; the performing of any statutory or legal obligation requirement of Section 458.331(1)(g), Florida Statutes; the not accepting and performing professional requirement of Section 458.331(1)(v), Florida Statutes; and the delegation of duties restrictions of Section 458.331(1)(w), Florida Statutes, with regard to the performance of office surgery as encompassing the following requirements and restrictions relating to the level of anesthetic, training, equipment and supplies, assistance of other personnel, and hospital staff privileges.
(4) Level III Office Surgery.
(a) Definition. Level III Office Surgery is that surgery which requires, or reasonably should require, the use of a general anesthetic or major conduction anesthetic and pre-operative sedation.
(b) Hospital Staff Privileges Required. The physician must have staff privileges to perform the same procedure as that being performed in the out-patient setting at a licensed hospital within reasonable proximity.
(c) Level of Anesthetic.
1. General Anesthetic: Loss of consciousness and loss of vital reflexes with probable requirement of external support of pulmonary or cardiac functions.
2. Major Conduction: epidural, spinal, caudal.
6. The surgeon must maintain complete records of the surgical procedure.
Violation of this Rule governing the practice of medicine is negligence. If you find that the person alleged to be negligent violated this Rule governing the practice of medicine in the State of Florida, such person was negligent. You should then determine if such negligence was a legal cause of loss, injury or damage complained of.