936 So.2d 585 (2006)
Wyon Dale CHILDERS, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 1D03-2154.
District Court of Appeal of Florida, First District.
February 2, 2006.
*587 Richard G. Lubin and Tama Beth Kudman, of Richard G. Lubin, P.A., West Palm Beach, for Appellant/Cross-Appellee.
Charlie J. Crist, Jr. Attorney General, and Trisha Meggs Pate, Assistant Attorney General, Tallahassee, for Appellee/Cross-Appellant.
EN BANC
PER CURIAM.
Wyon Dale Childers appeals his convictions for bribery and unlawful compensation or reward for official behavior. The convictions at issue here arose from the Escambia County Commission's purchase of property known as the "Elliot Property" or the Pensacola Soccer Complex. Appellant and Willie Junior were county commissioners who voted for the purchase, and Joe Elliot was the owner of the property. The State alleged that Appellant made a series of payments to Junior in return for Junior's vote to acquire the property and that Appellant and Junior voted to purchase the property to receive kickback payments from Elliot. Junior became a state witness against Elliot and Appellant, after the State and Junior entered into a plea agreement in exchange for Junior's truthful testimony.
Appellant challenges the trial court's rulings excluding the admissibility at trial of the State's attempt to revoke a plea agreement with Willie Junior, a key witness who testified at length against Appellant; the jury verdict acquitting Elliot; and the State's original indictment filed against Appellant. The State cross-appeals the trial court's rulings which excluded evidence that Appellant participated in another attempt to obtain county funding for a land purchase and which declined to order Appellant to pay restitution to Escambia County for losses incurred after selling the soccer complex. Concerning the issues raised on appeal, we conclude that, although the trial court erred in its conclusion that the State's attempt to revoke Willie Junior's plea agreement was irrelevant, the evidence was properly excluded under section 90.403, Florida Statutes (2002), because the limited probative value of this evidence was substantially outweighed by the danger of unfair prejudice. We therefore affirm the trial court's ruling under the so-called "tipsy coachman" rule. In addition, we affirm the trial court's rulings excluding the Elliot verdict and any evidence regarding the State's original indictment of Appellant. We reverse the restitution issue raised in the State's cross-appeal and decline to address the evidentiary issue raised on cross-appeal.[1]

*588 I. Background
A grand jury initially returned an indictment against Appellant charging him with one count each of money laundering, bribery, and unlawful compensation or reward for official behavior. At the time of the alleged unlawful activity, both Appellant and Junior served as Escambia County Commissioners. The State alleged that Appellant made a series of payments to Junior in return for Junior's vote in favor of acquiring the Pensacola Soccer Complex. According to the State, Appellant and Junior stood to receive kickbacks from the owner of the soccer complex, Joe Elliot, upon the County's purchase of the property. Elliot, Appellant, Junior, and others faced charges as a result of these allegations.
Several months before either Elliot or Appellant went to trial, Junior entered into a plea agreement with the State. Under the terms of his plea agreement with the State, Willie Junior pled nolo contendere to numerous charges, including bribery, and agreed to testify truthfully and completely regarding Elliot and Appellant's involvement in the commission's purchase of the soccer complex. In exchange, the State agreed that if Junior complied with the plea terms, it would "recommend a sentence no greater than eighteen months state prison," rather than the approximately 125 year maximum sentence. The State reserved the right to make a sentencing recommendation based on its determination that Junior had "provided substantial assistance in the investigation or prosecution of other persons who have committed offenses." The agreement vested the state attorney with "sole discretion" in determining whether Junior had provided this assistance.
Junior fulfilled his obligation to testify against Elliot in his December 2002 trial. During that trial, the defense attacked Junior's credibility. The jury ultimately acquitted Elliot of charges flowing from the soccer complex transaction. After the Elliot acquittal, in January 2003 Junior met with a State investigator and provided new information regarding Appellant's involvement in the alleged bribery scheme which differed substantially from certain information provided by Junior in previous statements. The primary matters about which Junior's January 2003 statements differed from prior statements concerned a note upon which Appellant had written "100/100;" Appellant's presentation of a cooking pot filled with money to Junior; and Appellant's statement indicating that he was "sick and tired of not being able to get three votes." Junior's revised statements regarding each of these events included new details tending to more fully show culpability on Appellant's part. Initially, Junior maintained that Appellant had written "100/100" on a notepad and passed it to Junior. According to Junior's earlier statements, Appellant had made no statements regarding the meaning of the note, but Junior took it to mean that they would each receive $100,000 if the soccer complex deal went through. In the January 2003 statements, Junior claimed for the first time that the passing of the note was accompanied by Appellant's direct statement that "if the soccer complex goes through, it will be a hundred for you and a hundred for me." Additionally, Junior *589 changed his story as to when the 100/100 note incident took place. Before his January statements, Junior maintained that the incident occurred after the commission voted to appraise the soccer complex property but before it voted to purchase it. In the revised statement, Junior said that Appellant gave him the note before the appraisal vote. He also added that Appellant stated, some time after the 100/100 note incident, that he was going to send Elliot to see Junior.
Similarly, Junior's January 2003 statements supplied previously absent commentary describing an incident where Appellant allegedly gave Junior a large cooking pot filled with money. In past statements, Junior had maintained that Appellant tendered a money-filled pot without speaking a word. In the January 2003 statement, however, Junior recalled that Appellant mentioned that he took $25,000 out of the pot. Later, Junior added further to his description by stating that Appellant told him that he took the $25,000, as well as another $10,000, from the pot.
In January 2003, Junior also recalled Appellant's alleged lamentation that he was "sick and tired of not being able to get three votes" (on the five-member commission). Apparently, Junior did not recall Appellant making such a statement until his meetings with the state investigator in January 2003. During the January meetings, Junior stated that Appellant had made this statement as early as May 2001. When asked more about this newly added detail, Junior recalled that Appellant made the statement at the time he passed Junior the 100/100 note.
After Junior provided this new information, the state attorney filed a "Notice of Revocation of Terms of Plea Agreement" in Junior's criminal case. The State asserted that Junior had failed to comply with the agreement by changing his testimony, failing to earlier give complete statements, and other allegations. The State asserted that
Mr. Junior has failed to disclose, in a timely manner, relevant, crucial and material information needed by the State of Florida in preparation of its cases, and thus, has provided inconsistent statements as to key events. Such failures and/or inconsistencies have resulted in damage to the State of Florida's prosecution of various defendants.
The State concluded by announcing its revocation of Junior's plea agreement.
Notwithstanding the state attorney's apparent plenary power to revoke the plea agreement under its terms, the trial court granted a hearing at which Junior's counsel argued that Junior had substantially complied with the terms of the agreement. The trial court agreed with Junior, ruling:
According to the terms of the plea agreement, the defendant [Junior] was required to testify truthfully; however, there is no evidence in the record ... that Mr. Junior was to testify truthfully to. Said in another way, there is nothing in the plea agreement that Mr. Junior must testify truthfully in a certain way so as to be clear as exactly what benefit the State expects to receive. Further, the written plea agreement states that Mr. Junior was to testify truthfully and completely, a subjective test at best. The statements he made on January 17th and 31st with State Attorney investigators, even if materially different from other statements and information previously given, were not under oath at a trial or hearing, and it does not indicate anything other than his willingness to assist the state in accordance with the plea agreement. Finally, the state . . . acquiesced that Mr. Junior had consistently maintained and testified to certain material evidence. In conclusion, *590 the Court [finds] that there has been substantial compliance with the written plea agreement, and for that reason, the State is without basis, at this time, to revoke it.
Following the trial court's ruling, the State replaced the original indictment against Appellant with an information that was later amended. The new information against Appellant included the additional information provided by Junior.
Appellant then filed a notice indicating his intention to introduce as evidence: the State's revocation notice; party opponent statements (by the state attorney) from Elliot's trial; and party opponent statements from the revocation notice hearing. On March 31, 2003, the trial court heard arguments on this notice and several other relevant motions filed by the State and defense. In addition to the items listed in his notice, Appellant sought to introduce the original indictment to highlight the changes incorporated by the State in its amended information after Junior changed his story. For its part, the State argued in support of its motion in limine seeking to exclude the verdict in the Elliot case.
Appellant also filed a motion in limine to exclude the trial court's order denying the State's attempt to revoke the plea agreement. Appellant argued that the order finding Junior had complied with his plea agreement was irrelevant and would constitute "improper bolstering." In addition, Appellant argued that the order's "probative value, if any, is substantially and overwhelmingly outweighed by the unfair prejudice." Thus, Appellant sought to have the jury hear only the State's accusations that Junior's later statements were not truthful and complete, and not a judicial ruling finding the State's accusations without merit.
The trial court excluded all evidence related to the State's attempted revocation of Junior's plea agreement, as well as the original indictment against appellant. The court found this evidence irrelevant to the State's case against appellant. The judge also observed that, if the State's attempt to revoke the agreement was admitted, the State would be allowed to establish that the judge found Junior in compliance with his plea agreement. In addition, the trial court also excluded the Elliot verdict finding, "among other things . . ., the prejudice would outweigh any probative value."
Appellant's case proceeded to trial. Junior testified consistently with the version of events he had related in January 2003. Although denied the opportunity to attack Junior's credibility through reference to the revocation proceedings and the Elliot acquittal, Appellant's defense counsel was allowed to impeach Junior with prior inconsistent statements.
At trial, Junior testified that, before the payment, Appellant wrote out the 100/100 note and said he and Junior would each receive $100,000 for voting for the purchase of the land. Junior also testified that Appellant gave Junior a cooking pot of money, purportedly including $100,000, less $25,000 which Appellant retained for some loan repayments and other considerations. The jury heard other evidence related to Appellant's alleged bribery of Junior, including a $40,000 payment from Appellant to Junior by cashier's check that occurred when Junior traded some of the currency back to Appellant for a check. Junior testified that he also received separate checks from Appellant in the amounts of $7,000, $10,000, $11,000, and $3,000, respectively. Junior acknowledged that Appellant wrote notations on the checks that the payments were loans to Junior, and that he ultimately signed a promissory note in the principal amount of $87,000 in favor of Appellant. Junior testified, however, that Appellant never attempted to *591 obtain repayment or security and that Appellant stated he would not attempt to collect the purported loans.
Appellant's counsel vigorously cross-examined Junior regarding Junior's plea agreement with the State and other related matters. The cross-examination continued for approximately 10 hours. During cross-examination, Appellant's counsel impeached Junior with his prior inconsistent statements. Junior also admitted, among other things, that he had initially borrowed $10,000 from Appellant to pay a tax debt; that he had further signed an agreement to transfer to Appellant the funeral home owned by Junior; that Appellant could not enforce the loan agreement, as any security was encumbered; and that he had no intention of paying Appellant any money. Junior stated that it would likely be a futile gesture for Appellant to attempt to sue on any of the agreements. Appellant's cross-examination concluded with questions regarding Junior's use of the money provided by Appellant.
On redirect examination, Junior testified that he was more concerned with making money from his vote on purchasing the soccer complex than whether the purchase was good for the county and that his vote was bought by Appellant. He stated that he thought Appellant wrote the 100/100 note before Junior had added the appraisal of the soccer complex to the commission agenda and that he signed the promissory note to Appellant after Appellant gave Junior a $7,000 check on December 28, 2001. According to Junior, Appellant never tried to collect on the note. Junior testified that there was approximately $180,000 in equity in his funeral home, but that Appellant did not attempt to use legal recourse to collect his loans.
Appellant's counsel was allowed to re-cross examine Junior for limited questions. Counsel established that Junior had attempted to sell his funeral home for years. Junior also acknowledged that the soccer complex was appraised for the value of the purchase price. Junior was recalled again to testify that he returned the pot allegedly containing the bribe to Appellant.
State Attorney Investigator Allen Cotton testified regarding phone logs and other matters. Appellant's counsel also vigorously cross examined Cotton, who acknowledged that Junior had given inconsistent testimony. On cross-examination, Cotton acknowledged that Junior had "given more information during this investigation" in response to the question "There is no question that he's changed his story on various matters along the way, is there?" Cotton conceded the following:
Q: Did you agree with me that he's changed his testimony about different things?
A: I would say there are some inconsistencies at issue.
Q: And the parties agreed under this agreement, that the state may revoke the agreement in the sole discretion of the State Attorney [if] any of the following circumstances have occurred.
Junior's refusal to cooperate by this agreement, right?
A: That's correct.
Q: His statements are incomplete or untruthful, correct?
A: That's the way it reads, yes sir.
Q: By the way, an incomplete statement means, one, where the witness does not give the full story about something, that's incomplete?
A: Yes sir, I believe that would be a correct summary.

[Emphasis supplied.]
During Appellant's case, Appellant's counsel called Cotton to testify regarding *592 Junior's inconsistent statements and Cotton's statements that the changes in Junior's statements would be a "problem." On cross-examination, the State elicited testimony that Junior had always been consistent regarding the fact that Appellant wrote the "100/100" note and that Junior had received money from Appellant placed in a pot. Investigator Hughes also testified during Appellant's case that Junior provided different descriptions of the alleged pot, once describing the item as a "bucket."
During its case-in-chief, the State sought to introduce evidence of another real property transaction involving Appellant, Junior, and Elliot. In that transaction, referred to below as the Jack Lee Buick deal, the three men allegedly worked together to have the County purchase an unneeded parcel of property. The State sought to show that Elliot, as the listing agent for the property, would have earned a substantial commission on the sale of this real property to the County, which, in turn, he would share with Appellant and Junior. The trial court chose to exclude the evidence finding no "similar fact evidence or occurrences which would make such evidence relevant, and, therefore, admissible in this cause." The court also found that "any probative value that could be determined would be outweighed by far, as far as the Court is concerned, by the prejudices that it would cause."
The jury found Appellant guilty of bribery and unlawful compensation or reward for official behavior, and not guilty of the money laundering charge. Because Escambia County incurred a loss of nearly $1 million in purchasing the soccer complex and later selling it, the State sought an award of restitution to the County. The trial court denied restitution, concluding that the County was not a "victim" entitled to restitution as defined by section 775.089(1)(a), Florida Statutes (2002).

II. Analysis
We apply the abuse of discretion standard of review in reviewing the trial court's decision to exclude the evidence with which Appellant sought to attack Junior's credibility. See Heath v. State, 648 So.2d 660, 664 (Fla.1994); Reed v. State, 783 So.2d 1192 (Fla. 1st DCA 2001). The "trial court's discretion is limited by the rules of evidence." Sybers v. State, 841 So.2d 532, 545 (Fla. 1st DCA 2003) (quoting Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001)). Under the rules of evidence, Appellant could attack Junior's credibility by "showing that a witness is biased." § 90.608(2), Fla. Stat. (2002). The relevancy standards of section 90.401 and section 90.403 limit the scope of evidence available to show Junior's bias. Section 90.401 defines relevant evidence as that evidence "tending to prove or disprove a material fact." Under section 90.403, "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice." In this case, the trial court's rulings were based upon findings that the excluded evidence was either irrelevant or of insufficient probative value when weighed against the danger of unfair prejudice.

A. The Junior Plea Agreement
When Appellant sought to introduce into evidence the State's attempted revocation of Junior's plea agreement, the trial court based its exclusion of this evidence on a finding that the evidence was irrelevant. We conclude that the trial court erred in ruling this evidence irrelevant. Although the reason stated by the trial court for excluding this evidence was erroneous, "if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which *593 would support the judgment in the record." Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla. 1999). "[T]here must have been support for the alternate theory or principle of law in the record before the trial court." Robertson v. State, 829 So.2d 901, 907 (Fla. 2002). This principle, referred to as the "tipsy coachman" rule, see Home Depot U.S.A. Co., Inc. v. Taylor, 676 So.2d 479, 480 (Fla. 5th DCA 1996), arises from the presumption of correctness with which the judgment of the trial court is clothed. See Cohen v. Mohawk, Inc., 137 So.2d 222, 225 (Fla.1962). In our view, the record here supports affirmance on a theory different than that adopted by the trial court. See Applegate v. Barnett Bank, 377 So.2d 1150, 1152 (Fla.1979) ("The written final judgment by the trial court could well be wrong in its reasoning, but the decision of the trial court is primarily what matters, not the reasoning used. Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it."); Muhammad v. State, 782 So.2d 343, 359 (Fla.2001)("[T]he trial court's ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling.").
Section 90.403, Florida Statutes (2002), provides:
Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
"Almost all evidence introduced during a criminal prosecution is prejudicial to a defendant." Williamson v. State, 681 So.2d 688, 696 (Fla.1996). In reviewing whether evidence is inadmissible under section 90.403, "a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded." Id. As Professor Ehrhardt explains:
Most evidence that is admitted will be prejudicial or damaging to the party against whom it is offered. Section 90.403 does not bar this evidence; it applies to evidence which is directed to an improper purpose, such as evidence that inflames the jury or appeals improperly to the jury's emotions or that an accused committed the charged crime because of evidence of the bad or evil character of the accused. Only when that unfair prejudice substantially outweighs the probative value of the evidence is the evidence excluded.
Charles Ehrhardt, Florida Evidence, § 403.1 at 163-64 (2004 ed.)(footnotes omitted).
We recognize that the State's notice to revoke could have forced Junior to believe it was in his best interest to testify consistently with his latest and most detailed version of events. The attempted revocation of Junior's plea agreement, however, was of limited probative value for several reasons. First, the evidentiary impact of the notice was reduced substantially when the trial court ruled that Junior had complied with the plea agreement and denied the attempted revocation. Certainly, as the trial court stated when ruling on the inadmissibility of the notice of revocation, if the notice to revoke were admitted into evidence, the trial court's order denying the motion would be allowed into evidence as well.
*594 This court has recognized that the balancing test for excluding evidence under Section 90.403, Florida Statutes, requires that a court carefully evaluate the probative value of the evidence to the party favoring admission, and compare this to the unfair prejudice to the party opposing admission. Marchina v. State, 702 So.2d 1369 (Fla. 1st DCA 1997). In Marchina, a defendant facing sexual-battery charges mentioned on direct examination that he had "trouble" before with law-enforcement officers, explaining why he left a trailer park when he saw law enforcement officers. The trial court allowed the prosecutor to cross-examine Marchina on this statement and force his admission that the previous "trouble" included a prior arrest on unrelated charges involving "little girls." On appeal, this court agreed with the Marchina defendant that this evidence should be excluded under section 90.403, Florida Statutes.
One factor crucial to this court's decision in Marchina was that the evidence in question "had very little legitimate probative value for the prosecution." Id. This limited legitimate probative value was outweighed by the unfair prejudice caused by the focus of the evidence on the defendant's "bad character" or "propensity," prohibited by Section 90.404, Florida Statutes. Similarly here, as noted above, the evidence in question actually had little probative value in Appellant's defense, as its admission would have resulted in the jury hearing that the trial court had found Junior to be in compliance with his agreement to testify "truthfully." This, no doubt, explains why Appellant attempted to exclude the trial court's ruling. We further note that, like the evidence in Marchina, an arrest in another case, the evidence which Appellant attempted to admit here involved another proceeding, Junior's criminal case. As was the case with the evidence in Marchina, here the limited probative value of the State's Notice to Revoke was far outweighed by unfair prejudice to Appellant himself and the State.
Second, from the testimony of both Investigator Cotton and Junior, the jury learned that the State could revoke Junior's plea agreement if he did not testify truthfully. Thus, the notice would serve merely to emphasize facts already in evidence.
Finally, Appellant's counsel vigorously and extensively cross-examined Junior on his plea agreement and the State's right to revoke the agreement if Junior failed to testify truthfully. As noted above, defense counsel ably demonstrated to the jury that Junior had changed his testimony by January 2003. For example, the following exchanges occurred during the defense cross examination of Willie Junior:
Q. So let's talk about some of the responsibilities and benefits to both sides of that [plea] agreement. Okay? All right?
A. Go ahead.
* * *
Q. Now, you agreed in this plea agreement to give truthful information to the State Attorney; correct?
A. That's correct.
* * *
Q. On the very first page [of the plea agreement] in yellow, it says, it's underlined: "However, if any information Junior provides is determined to be false, this grant of immunity is withdrawn, and, additionally, the state may prosecute Junior for offenses relating to the giving of false statements or perjury"; right?
A. Right.

*595 Q. So you knew that provision to mean that if the state felt that you had testified falsely or given false information, the deal would be off, or could be, the immunity would be off for the other offenses that you may have committed, and you could be prosecuted for something like perjury, right, that's what it meant?
A. Right.
* * *
Q. Okay. Now you were asked by Mr. Simon on direct examination about what you're looking at here, and under the terms of the agreement, you testified that you're now looking at a maximum sentence of 18 months in prison for these ten felonies; right?
A. That's correct.
Q. But there is no bottom to what you could get; right? In other words, you could get 17 months, you could get zero, you could get probation; right?

A. That would be up to the judge.
Q. Right. And you hope you do; right?
A. Wouldn't you?
* * *
Q. So, let's talk about what the truth does mean to you then. All right? Because that's really the essence of your obligations under the agreement, because if you don't fulfill the agreement, all deals are off; right?

A. That's correct.
Q. In other words, if the state decides  if you lie under this agreement, you can be prosecuted  you're not looking at 18 months anymore, you're looking at 125 years; right?

A. I don't know the exact number, but if you lie, you have to deal with the consequences, what the lie was about.
Q. And not only could you be charged with perjury, but the immunity provisions go away; right?
A. I would think so.
(Emphasis added). Thus, the jury was well aware of the plea agreement, the State's ability to revoke it, and Junior's motivation to cooperate created by the threat of revocation. The introduction of the notice to revoke and the order denying the motion would have added little of probative value to what the jury had before it.
On the other hand, the introduction of the notice to revoke would have been highly prejudicial. The admission of the notice would have been similar to admitting an opinion by the State concerning Junior's character, truthfulness, and credibility. Such opinion testimony regarding a witness' reputation for truthfulness is clearly inadmissible. See Antone v. State, 382 So.2d 1205, 1213-14 (Fla.1980) (holding improper a question of a witness which sought "to elicit the individual and personal view of the witness."); Hernandez v. State, 575 So.2d 1321, 1322 (Fla. 4th DCA 1991) (holding that it was reversible error to admit testimony of police officers and teacher that sexual abuse victim was truthful. "A witness invades the jury's exclusive province when that witness gives his or her personal views of the credibility of another witness."); Alvarado v. State, 521 So.2d 180, 181 (Fla. 3d DCA 1988) (holding that an opinion of a witness concerning his or her belief as to the truthfulness of another witness "was clearly inadmissible."); Morrison v. State, 818 So.2d 432, 451 (Fla.2002) (holding that it was improper to allow personal opinion to establish reputation for truthfulness without laying a foundation based on knowledge of the *596 witness' reputation in community for truthfulness); Wyatt v. State, 578 So.2d 811, 813 (Fla. 3d DCA 1991) (holding that section 90.405, Florida Statutes, does not permit opinion testimony regarding evidence of character); Ehrhardt, Florida Evidence § 405.2 at 258 ("Opinion testimony concerning a person's character has traditionally been inadmissible on the basis that it is too unreliable; it will be tainted by the underlying prejudice and bias of the person expressing the opinion.")(footnote omitted). In our view, the type of testimony sought to be introduced by Appellant was likely to distract the jury during their deliberations; improperly influence the jury's evaluation of Junior's veracity, where the credibility of his testimony was a central issue; and prejudice the State's case with unreliable evidence. Because the prejudice to the State that would be created by the admission of the notice to revoke substantially outweighs the very limited probative value of this evidence, the notice was excludable under section 90.403, Florida Statutes.

B. The Elliot Verdict and the Original Indictment
In addition to his attempt to introduce the State's Notice to Revoke Junior's plea agreement in Junior's criminal case, Appellant moved the trial court to admit the Elliot acquittal in Appellant's trial. We agree with the trial court that the Elliot verdict was not admissible in Appellant's criminal trial. Verdicts from other cases are generally inadmissible. Secada v. Weinstein, 563 So.2d 172 (Fla. 3rd DCA 1990). The trial court did not abuse his discretion in excluding this evidence.
We further agree that the trial court did not abuse its discretion in excluding the state's original indictment of Appellant. A comparison of the amended information to the original indictment demonstrates, at best, additional details of the same charges. The probative value of the indictment, with regard to Junior's credibility, is far too attenuated to support a conclusion that the trial court abused its discretion in excluding the instrument. Moreover, under section 90.403, the trial court may, and did, properly guard against undue prejudice, in particular, any suggestion that the prosecution did something wrong or unfair by amending the charges.

C. The Jack Lee Buick Deal
The State cross-appeals the trial court's ruling excluding this evidence under section 90.404, Florida Statutes. Because we affirm Appellant's convictions, we decline to review this issue.

D. Restitution
The State argued below for restitution, noting that Escambia County suffered a loss of nearly $1 million when it sold the soccer complex after the commission's purchase. The trial court denied restitution, ruling that Escambia County was not a "victim" as that term is used in section 775.089, Florida Statutes (2002).
Section 775.089(1) mandates an award of restitution to victims. Section 775.089(1)(c) defines a "victim" as a "person who suffers property damage or loss, monetary expense, or physical injury or death as a direct or indirect result of the defendant's offense or criminal episode. . . ." (emphasis added). Section 1.01(3), Florida Statutes (2002), defines "person," as follows:
The word "person" includes individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.
*597 (emphasis added). The appellant argued below and argues on appeal that, since Escambia County is a political subdivision of the state, rather than a "person" as defined in section 1.01(3), section 775.089 does not authorize a restitution award in favor of the county. We do not agree, reverse the denial of restitution, and remand for further proceedings.
In section 1.01(3), the legislature has defined "person" by providing a list of people and entities each of which is deemed a "person." Because "person" "includes" the list of individuals and entities, we conclude that the legislature did not intend this list to be a limiting and exhaustive definition of the term. In standard usage, the use of the term "include" does not indicate that a list of subjects is exhaustive. Blacks Law Dictionary 766 (7th ed.1999) defines "include" in pertinent part, as follows:
include, vb. To contain as a part of something. The participle including typically indicates a partial list . . . .
Similarly, the author Bill Bryson explains that "include indicates that what is to follow is only part of a greater whole. To use it when you are describing a totality is sloppy.. . ." Bill Bryson, Troublesome Words 101 (3d ed.2001). If the statute provided that "person" included "only" those individuals and entities specifically mentioned in the statute, or defined "person" using the more exhaustive word, such as "means," we would agree with the appellant's argument. By the use of the non-limiting term "includes," however, the list used to define "person" is illustrative rather than exhaustive. See, e.g., Matter v. Krehl, 86 F.3d 737, 741 (7th Cir.1996); Standard Oil Co. of Calif. v. Federal Trade Comm'n, 596 F.2d 1381, 1384 (9th Cir.1979), rev'd on other grounds, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980); Toombs v. City of Champaign, 245 Ill.App.3d 580, 185 Ill.Dec. 755, 615 N.E.2d 50, 52 (1993).
In considering whether Escambia County is a "person" in the context of section 775.089(1), we also find persuasive the Second District's reasoning in South Florida Water Mgmt. Dist. v. Layton, 402 So.2d 597 (Fla. 2d DCA 1981). In Layton, the plaintiff sought to establish a statutory way of necessity pursuant to section 704.01(2), Florida Statutes (1979). Section 704.01(2) provided for a statutory way of necessity under certain defined circumstances where land is "shut off or hemmed in by lands, fencing, or other improvements of other persons. ..." (emphasis added). The Water Management District argued that it was not a "person" under section 704.01(2), because a body politic is not included within the definition of "person" in section 1.01(3), Florida Statutes (1979). Holding that the Water Management District was a "person" under 704.01(2), the Layton court explained:
Appellant contends that section 704.01 does not apply to it because it is not a "person" within the intendment of the statute and sovereign immunity has consequently not been waived. Chapter 704 does not define the word "person." Consequently, appellant urges, chapter 1, which contains definitions for construction of all statutes where context permits, is therefore applicable. "Person" is defined in section 1.01(3) to include "individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." A separate definition exists for "public body," "body politic," or "political subdivision," which are defined as including: "counties, cities, towns, villages, special tax *598 school districts, special roads and bridge districts, bridge districts and all other districts in this state." Thus, for purposes of chapter 704, appellant concludes, a special district is not a "person." We disagree. Under the express provisions of section 1.01, the definitions contained therein apply only where the context permits. Had section 704.01 made a distinction between "persons" and "public bodies," "bodies politic," or "political subdivisions," we would agree with appellant. However, section 704.01 makes no such distinction, and we see no basis for necessarily assuming the legislature intended one here. For the reasons set forth below, we conclude that the legislature intended to include the state and its agencies within the meaning of "persons" as used in section 704.01.
Layton, 402 So.2d at 598; see also City of Gainesville v. State, Dep't of Transp., 778 So.2d 519, 528 n. 5 (Fla. 1st DCA 2001)(Department of Transportation is a "person" within meaning of section 180.13(2), Florida Statutes (2000)).
Further, in chapter 960, Florida Statutes (2002), we find unmistakable legislative intent that a county is entitled to restitution pursuant to section 775.089(1). In authorizing the imposition of civil restitution liens, the Florida Legislature expressed its intention to "enable crime victims, the state, and other aggrieved parties to recover damages and losses arising out of criminal acts ...." § 960.29(1)(a), Fla. Stat. (2002). Most significantly, the legislature further provided, that "[n]otwithstanding this civil restitution lien act, the crime victim, the state and its local subdivisions, or other aggrieved parties are not precluded from collecting . . . moneys awarded by a restitution order under s. 775.089. ..." § 960.295(2), Fla. Stat. (2002)(emphasis added).
Finally, reading section 1.01(3) to exclude a governmental unit from recovering restitution as a victim, under a statute in which the crime victim is referred to as a "person," would lead to absurd results. Several criminal statutes refer to crime victims by use of the term "person." See, e.g., §§ 831.01, 831.02, 831.07, 831.09, Fla. Stat. (2002). By its use of the term "person" in these statutes, the legislature obviously did not intend to insulate from criminal responsibility those persons who victimize Florida counties through commission of the acts proscribed by these statutes. Indeed, legislative intent to include counties within the term "person" when the term is used to refer to a crime victim was recognized by the Florida Supreme Court more than a century ago in Darby v. State, 41 Fla. 274, 26 So. 315 (1899).
The cases on which appellant relies, Lewis v. State, 874 So.2d 18, 20 (Fla. 4th DCA 2004); Jones v. State, 846 So.2d 662, 662-63 (Fla. 2d DCA 2003); Sheppard v. State, 753 So.2d 748 (Fla. 2d DCA 2000); and Sims v. State, 746 So.2d 546 (Fla. 2d DCA 1999), do not address the issue raised here: whether a county is barred from entitlement to restitution pursuant to section 775.089 because it is not a "person." In each of these cases, the court recognized that section 775.089 did not allow restitution to a governmental entity for investigative, prosecutorial, or supervisory costs relating to the prosecution of the defendant because these expenses do not constitute the type of loss necessary to make the entity a "victim" within the meaning of the statute. We have no disagreement with the holdings in these cases. Unlike the case before us, however, none of these cases involved losses incurred as a result of the defendant's criminal activity. Where a governmental entity incurs financial losses because it is the *599 victim of the defendant's criminal activity, rather than incurring costs relating to investigation, supervision or prosecution, we hold that restitution is recoverable.
DAVIS, VAN NORTWICK, PADOVANO, LEWIS, HAWKES and THOMAS, JJ., concur.
ALLEN, J., concurs with written opinion in which DAVIS, VAN NORTWICK, PADOVANO, LEWIS, HAWKES, and THOMAS, JJ., concur.
THOMAS, J., specially concurs with written opinion in which HAWKES, J., concurs.
KAHN, C.J., concurs in part and dissents in part with written opinion in which ERVIN, J. concurs and WOLF, BROWNING and POLSTON, JJ., concur in part.
ERVIN, J., concurs in part and dissents in part with written opinion in which KAHN, C.J. concurs and WOLF, J., concurs in part.
WOLF, J., concurs in part and dissents in part with written opinion in which KAHN, C.J., and ERVIN, J., concur in part.
WEBSTER, J., concurs in part and dissents in part with written opinion in which ERVIN, J., concurs in part.
BENTON, J., concurs in part and dissents in part with written opinion.
BROWNING, J., concurs in part and dissents in part with written opinion in which ERVIN, J., concurs in part.
POLSTON, J., concurs in part and dissents in part with written opinion in which KAHN, C.J. and ERVIN and BROWNING, JJ. concur.
ALLEN, J., concurring.
I fully concur in the majority opinion and write only to offer some brief observations regarding our en banc consideration of this case. Florida Rule of Appellate Procedure 9.331 authorizes en banc consideration of a "case" of exceptional importance. Although some members of this court would apparently limit this authority to those cases in which a legal "issue" of exceptional importance is presented, it seems to me that there may be circumstances in which the involvement of a particular party in a case or some unique aspect of the case's procedural history could cause the case to be of exceptional importance even though the precise legal issues involved might be of a rather routine nature. In the present case, however, even the demanding standard of those judges who would require an issue of exceptional importance is amply satisfied by this court's reversal of the trial court's denial of restitution in the amount of nearly a million dollars. Restitution for this very substantial sum is obviously important to the defrauded taxpayers of Escambia County. Even more significantly, however, our resolution of this issue firmly establishes the exceptionally important principle that political subdivisions of the State of Florida are entitled to restitution for their financial losses when they fall prey to persons violating the criminal laws of this state.
THOMAS, Specially Concurring.
I concur in the court's opinion. I write to express my view that even if the trial court erred by excluding the State's Notice To Revoke Junior's Plea Agreement, the error was harmless. See Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that cross examination errors are subject to harmless error analysis).
*600 The Florida Supreme Court has held that:
The solemn obligation of the Court to perform an independent harmless error review and establish the analysis to be applied in performing that review is so critical to the appellate function that this Court has satisfied its obligation to review for harmless error, even when the State has not argued that the complained of error was harmless. See Heuss v. State, 687 So.2d 823 (Fla.1996). We concluded in that case that regardless of any lack of argument on the issue by the state, [t]he court must still be able to conclude beyond a reasonable doubt, after evaluation of the impact of the error in light of the overall strength of the case and the defenses asserted, that the verdict could not have been affected by the error.
Goodwin v. State, 751 So.2d 537, 545 (Fla. 1999) (emphasis in original). Here, the State did assert harmless error, although its rationale differs from this concurring opinion. In viewing the overall strength of the State's case, the defenses asserted, Appellant's obvious interest in excluding the entire context of the evidence at issue, and the record as a whole, I believe that any purported error was harmless, as defined by the Florida Supreme Court. Several significant factors support this determination.

Appellant's Attempt to Exclude Trial Court Ruling On Junior's Plea Agreement
The most significant fact that any error was harmless was Appellant's attempt to exclude the trial court's ruling that Willie Junior had complied with the plea agreement. Appellant filed a motion in limine to keep the jury from learning that the trial court found that Junior had complied with his obligations under his plea agreement.
The trial court stated that if the State's Notice to Revoke was admitted, then the trial court's ruling denying the revocation would be admitted into evidence. The trial court's ruling would have been legally correct. See Tompkins v. State, 502 So.2d 415 (Fla.1986) (holding that defense counsel opened the door to the State's redirect questions establishing that the murder victim had begged her mother to stay out of relationship with the defendant); Wright v. State, 582 So.2d 774 (Fla. 2d DCA 1991) (holding that defense counsel on cross examination opened the door to allow the State on redirect examination to introduce statements of accomplice inculpating defendant). Cf. Pacheco v. State, 698 So.2d 593, 595 (Fla. 2d DCA 1997) (holding that the trial court erred in allowing the State on redirect examination to introduce co-defendant's statements against defendant where defense only opened the door to testimony that co-defendant had led police to suspect defendant). Under the doctrine of completeness, the jury would have heard that the trial court found Junior's changed story was not a violation of Junior's obligation to testify truthfully.
If the trial court had allowed Appellant to cross examine Junior regarding the State's Notice to Revoke Junior's plea agreement, then Junior's testimony on redirect examination explaining that the trial court found Junior in compliance with the plea agreement would be admissible. The admission of this testimony would have harmed Appellant's defense. This explains why Appellant's attorney wisely attempted to exclude the ruling.
Appellant wanted the jury to hear only that the State attempted to revoke Junior's plea agreement, not that the trial court denied the State's attempt. Thus, any error in excluding the State's unsuccessful attempt to revoke Junior's plea *601 agreement was harmless beyond a reasonable doubt when viewed in the context of the trial court's ruling that Junior had not violated the agreement.

Evidence of Guilt and Cross Examination of Junior
An additional persuasive factor supporting a harmless error finding is the substantial record evidence of Appellant's guilt. See Larkins v. State, 655 So.2d 95, 99 (Fla.1995) (holding that when viewed in the context of the overwhelming evidence of guilt and the "questionable weight" of the excluded cross examination evidence, the trial court's error in limiting defendant's impeachment of witnesses was harmless). See also, Davis v. State, 711 So.2d 1314 (Fla. 2d DCA 1998) (holding that because there was strong evidence of defendant's guilt, the trial court's error in granting the State's motion in limine preventing the cross examination of victim regarding pending charges was harmless). The State's case against Appellant must be considered in relation to another factor supporting a harmless error finding, which is Appellant's cross examination of Junior.
Appellant cross examined Junior extensively regarding his plea agreement with the State. This is not a case where a defendant was unable to present a defense due to a trial court ruling excluding impeachment of a key witness. The Florida Supreme Court stated that an error limiting cross examination could be held harmless when reviewed in the proper context:
In Delaware v. Van Arsdall, ... the Court held that curtailing or denying cross examination could be harmless error if certain criteria are met. Those criteria include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
Livingston v. State, 565 So.2d 1288, 1291 (Fla.1988) (citations omitted).
In this case, the purported error in limiting cross examination was harmless, as established in part by extensive circumstantial evidence buttressing Junior's direct testimony. The record established that any evidence regarding the State's attempt to revoke Junior's plea agreement would have been generally cumulative. Defense counsel presented exhaustive testimony concerning Junior's inconsistent statements, his pending charges, his motivation to please the State to avoid criminal prosecution, and his financial distress. The record demonstrates that any marginal evidentiary value Appellant lost by his inability to raise the State's unsuccessful attempt to revoke Junior's plea agreement did not affect the verdict. Appellant's extensive and vigorous defense, including his successful defense against the money laundering charge, demonstrated that Appellant was sufficiently allowed to assert his theory of the case.
In contrast to Appellant's cross examination of Willie Junior, there was record evidence corroborating Junior's testimony, both in significant and minor details. For example, Junior testified that he received a pot of money from Appellant; there was testimony that Appellant had pots and pans in his office, including a pot somewhat similar in size to the pot introduced by the State. Additional evidence established that Junior had use of extensive cash; a witness observed Junior paying a debt from a 3/4-inch to 1-inch thick bankroll around the time of the alleged bribe. Additionally, Junior purchased a floor safe around the time of the alleged bribe.
*602 Other evidence established that the land purchase was not a legitimate and normal county commission action, as Junior implicitly and explicitly claimed. The Director of Administrative Services for Escambia County testified that the purchase of the soccer complex required changes in other county projects to provide the funds for the purchase. Several priority projects were delayed, including a road prison and courthouse renovations.
Despite the above issues, the land purchase was closed and resulted in a net proceed to Elliot Properties of $561,931.80, and Appellant played a significant role in the purchase. Evidence established that Appellant, as county commission chairman, made a motion at the county's November 1, 2001, meeting to "add on" the item proposing the purchase of the soccer complex. The commission had previously rejected the purchase before Appellant's election in 2000.
Other circumstantial evidence demonstrated that Appellant, Willie Junior, and Joe Elliot were working together very closely to ensure the final purchase of this property. State Attorney Investigator Allan Cotton established that numerous telephone calls were made between Appellant, Junior, and Mr. Elliot. On February 3, 2002, the day a newspaper story was published about the purchase of the soccer complex, Appellant called Junior and Mr. Elliot before 5:00 a.m. Although Investigator Cotton acknowledged on cross examination that there was no evidence that Junior returned Appellant's telephone call or that they talked that day, the number of telephone calls between Appellant, Junior, and Elliot demonstrated that the three were talking quite often while the property purchase was proposed and completed.
Other evidence corroborated Junior's testimony that the money received from Appellant was not a loan. Testimony established that Appellant failed to ensure that the alleged loan from Junior would be collectable, despite Appellant's extensive familiarity with the proper legal procedures.

Appellant's Defense
In addition to the evidence corroborating Junior's testimony that he and Appellant received payment for their votes, Appellant presented evidence which, at least in part, corroborated Junior's testimony and the State's case. Most significantly, Appellant acknowledged that he gave Junior large sums of money for what Appellant claimed were loans.
Appellant testified he loaned Junior $10,000 on May 31, 2001, with the expectation of repayment with interest. Appellant made further loans to Junior with the understanding that the money would either be repaid or Appellant would obtain Junior's funeral home. On December 5, 2001, Appellant loaned Junior $40,000. On February 16, 2002, Appellant and Junior executed a note which stated "replace prior notes." Appellant denied ever giving Junior cash.
A later agreement was signed by Appellant and Junior on December 28, 2001, covering all previous loans, in which Appellant would either receive Junior's funeral home or the right to sell the property if the loans remained unpaid. Appellant testified that he expected to make a profit from obtaining Junior's funeral home. Appellant acknowledged entering another agreement on February 16, 2002, in which Junior agreed he owed Appellant $81,000, and if repayment was not made, Appellant would be entitled to Junior's funeral home property. Appellant acknowledged that earlier agreements had been lost.
Appellant loaned Junior another $9,000 and helped Junior obtain an attorney regarding apparently unrelated federal issues. *603 When Junior exhibited unusual behavior, Appellant testified he was not going to loan him more money.
On February 25, 2002, after the investigation became public, Junior and his wife acknowledged in writing that Appellant could act as an agent to sell the funeral home. Appellant acknowledged that a mortgage was filed against Junior's funeral home by another party on April 10, 2002, and that this would make collection of the debt more difficult.
Appellant acknowledged calling Junior and Mr. Elliot before 5:00 a.m. on February 2, 2002, the day the newspaper article appeared casting suspicion on the soccer complex purchase. Appellant testified that he read the newspaper early that morning and wanted to know if there was any truth to the allegations. He testified that he knew he did not take any money, and thus wanted to question Junior and Elliot. Appellant denied any criminal acts.
On cross examination, Appellant admitted that he filed or had filed on his behalf more than 600 real estate transactions in Escambia County. Appellant acknowledged that he knew a mortgage deed must be filed to ensure the ability to foreclose on property serving as security on a note. Appellant was repeatedly questioned by the State to clarify why he took no action to protect his right to Junior's property, which allegedly served as security, in light of Appellant's practice of protecting his interest in other loans. Appellant acknowledged that he knew there was a problem on February 25, 2002, when Junior acted strangely. However, Appellant did not seek to pay documentary stamps or make a Uniform Commercial Code filing, even on June 2, 2002, when Junior's note was past due.
Appellant acknowledged that he knew Junior was "beyond desperate" and having financial difficulties when he loaned Junior $10,000 on May 31, 2001, which was due and payable in six months at eight percent interest. Yet on December 5, 2001, after Junior failed to repay any of this $10,000 debt, Appellant loaned Junior another $40,000, and did not secure his interest on this loan. Appellant stated that he told many people that he loaned Junior the $40,000, including the Pensacola News Journal.
Appellant acknowledged the telephone records showing extensive contacts with Junior. He indicated that he only attempted to contact Junior seven times between January and June 2001, but attempted to contact Junior hundreds of time from June 2001 through February 8, 2002. He testified that he did not talk about county business during those contacts. Appellant acknowledged that without Junior's vote, Joe Elliot, described by the State as Appellant's "30-year friend," would not have made approximately $561,000 from the county's purchase of the soccer complex.

Conclusion
As shown by the above summary, the jury heard extensive evidence of Appellant's guilt and a vigorous defense asserted by Appellant. In my view, there is no reasonable possibility that the trial court's exclusion of the evidence affected the verdict, when the error is viewed in light of the doctrine of completeness and in light of the record as a whole. See Cardenas v. State, 867 So.2d 384 (Fla.2004) (holding that harmless error analysis requires appellate courts to determine that there is no reasonable possibility that error affected the verdict). See, e.g., Williamson v. State, 894 So.2d 996, 999 (Fla. 5th DCA 2005) ("For the harmless error rule to apply, the State must prove there is no reasonable possibility the error contributed to the defendant's conviction.... After a review of the testimony, documentary *604 and physical evidence, and expert opinions offered in this case, we are convinced that the State demonstrated that the error was harmless beyond a reasonable doubt.") (citations omitted). Appellant aggressively cross examined Junior. In addition, the excluded information would have added very little to what the jury already knew about Junior. Finally, as the State urged in its closing argument, the jury obviously discounted Junior's motive to lie for a more lenient sentence in light of the corroborating evidence of guilt.
Accordingly, I would affirm on the additional basis that the trial court's ruling, if error, was harmless beyond a reasonable doubt.
KAHN, C.J., concurring in part, dissenting in part.
I respectfully disagree with the majority's finding that the State's attempted revocation of Junior's plea agreement and Elliot's acquittal were properly excluded under section 90.403, Florida Statutes (2002). Although I agree with the majority as to the remaining issues on the direct appeal,[2] I concur with Judge Ervin's dissent on the threshold question of en banc consideration. I also completely agree with the second and third paragraphs in Judge Wolf's opinion concerning the purported reasons that this court has taken the case en banc. Nevertheless, as the author of the original panel opinion in this case, I am compelled to reach the merits and particularly to express my views where they disagree with the en banc majority. Accordingly, even though I am firmly convinced this court does not have the jurisdiction to take this case en banc, a majority of the court feels otherwise and, for that reason, the first portion of my opinion goes to the merits.

MERITS

A. The State's Attempted Revocation of Junior's Plea Agreement
I conclude that the trial court abused its discretion by excluding mention of the revocation notice and certain statements made by the State during the revocation hearing. This evidence would have tended to show that the State entertained serious doubts about the credibility of its key witness and, most importantly, that the revocation attempt effectively forced Junior to stick to his latest and more detailed version of events. Although the evidence would have been prejudicial to the State, it would not have been unfairly prejudicial.
The State's revocation notice was admissible for the same reasons that support the admissibility of a plea agreement or documents showing a continuing relationship with the State. In Davis v. Alaska, the U.S. Supreme Court observed:
A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, *605 and is "always relevant as discrediting the witness and affecting the weight of his testimony."
415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (emphasis added) (citations omitted). Here, the trial court's exclusion of examination relating to the State's attempted revocation of Junior's plea agreement precluded the jury from considering a feasible source of bias in Junior's testimony.
"It is well established that great latitude is allowed the defense in the cross-examination of a witness to determine his interest, his opportunities for observation, his disposition to speak truthfully, and his ability to speak accurately." Cruz v. State, 437 So.2d 692, 694 (Fla. 1st DCA 1983); see also Hair v. State, 428 So.2d 760, 762 (Fla. 3d DCA 1983); Henry v. State, 688 So.2d 963, 966 (Fla. 1st DCA 1997). The latitude allowed in cross-examination arises out of the defendant's right to confront an adverse witness under the Sixth Amendment to the U.S. Constitution. See Lewis v. State, 591 So.2d 922, 925 (Fla. 1991) (finding limitations on cross-examination "clearly unreasonable where ... they have the effect of precluding constitutionally adequate cross-examination"). Florida courts have routinely applied the premise of Davis v. Alaska to establish "that a defendant has the right to fully cross-examine an adverse witness to reveal any bias, prejudice, or improper motive the witness may have had in testifying against the defendant." Yolman v. State, 469 So.2d 842, 843 (Fla. 2d DCA 1985). The rule takes on increased importance where a key witness is being examined. As the supreme court has stated:
The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one's accusers. One accused of crime therefore has an absolute right to full and fair cross-examination. Coco v. State, 62 So.2d 892 (Fla.1953). A limitation on cross-examination that prevents the defendant from achieving the purposes for which it exists may be harmful error.
The proper purposes of cross-examination are: (1) to weaken, test, or demonstrate the impossibility of the testimony of the witness on direct examination and, (2) to impeach the credibility of the witness, which may involve, among other things, showing his possible interest in the outcome of the case.
Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982); see also Watts v. State, 450 So.2d 265 (Fla. 2d DCA 1984).
As an example, when a key prosecution witness is awaiting sentencing in another case, the defense may demonstrate that such witness "has a desire to testify so as to please the authorities." Watts, 450 So.2d at 268. Such an inquiry "is permissible for the purpose of demonstrating the witness' bias or motive for testifying for any reason other than to tell the truth." Id. The right of full cross-examination in order to expose a motivation for a witness to testify untruthfully "is a fundamental tenet of due process." Tomengo v. State, 864 So.2d 525, 530 (Fla. 5th DCA 2004). Courts have even been so blunt as to posit that a "trial court does not have the discretion to exclude questions which touch upon interest, motive, or animus." Id.
Despite the paramount importance of such cross-examination, a trial court may limit examination of the State's witness "to take account of such factors as `harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" Lewis, 591 So.2d at 925 (quoting Olden v. Kentucky, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988)); see also Moore v. State, 701 So.2d 545, 549 *606 (Fla.1997). Given the priority afforded by our law to full cross-examination, however, I conclude that the trial court's exclusion of evidence relating to the State's attempted revocation of Junior's plea deal did not achieve any of the recognized purposes for limiting cross-examination. The nature and potential impact of the excluded evidence leads me to conclude that it would have been much more than "marginally relevant" to appellant's defense. Rather than being repetitive or confusing, the excluded evidence may well have assisted the jury in viewing the full picture which the defense sought to develop. Moreover, exclusion of the evidence did not shield Junior from undue harassment, nor did it serve to ensure his personal safety.
I cannot credit the State's contention that the revocation was insufficient to show bias on Junior's part because: 1) he changed his story before the State filed the notice; and 2) the trial court denied the revocation before Junior testified at appellant's trial. The State argues that the notice did not exert continuing pressure on Junior to testify in a certain manner. The notice itself, however, demonstrates that Junior added substantial and graphic details to his story that were exceptionally harmful to appellant's case. The addition of these details provoked the State into the attempted revocation of Junior's plea agreement. A jury made aware of the events immediately preceding Junior's testimony could have reasoned that Junior was bound to stick to the latest version of his story for fear that the State may once again attempt a revocation of his plea agreement. Given the broad discretion granted to the State Attorney in determining whether Junior had provided "substantial assistance," I find it unreasonable to conclude that Junior would feel no pressure at all to testify in conformity with his January statements.
Whether the State would have, in fact, retaliated against Junior for failing to testify in accordance with his new story, is irrelevant to the issue of bias. The important consideration is whether the jury could have concluded that the attempted revocation affected Junior's credibility. In Fannin v. State, 581 So.2d 974 (Fla. 1st DCA 1991), this court addressed the distinction between a witness' perception of the facts and the actual facts. In that case, the trial court ruled that the defendant could not cross-examine his co-defendant regarding her understanding of any deal the State may have had with the co-defendant's mother, who had been charged with drug offenses. Id. at 975. This court concluded that "the trial court abused its discretion by unduly restricting appellant's right to cross-examine [the witness] on the issue of her perception of any deals made with her mother." Id. at 976. In Cruz v. State, this court observed:
[A] defendant's right to cross-examine a witness about any deals that may have been made or any understandings that may have been reached between the government and one of its witnesses does not hinge on whether in fact any such deals or understandings were effected.... "What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists."

437 So.2d at 697 (quoting United States v. Mayer, 556 F.2d 245, 249 (5th Cir.1977)). Cruz instructs that "the defense's right to question a witness as to what representations were made to him is not dependent on whether they were approved by the court; the inquiries are germane to developing the witness's interest or bias in testifying." Id. Here, the appellant sought to reveal a circumstance which could have impacted Junior's testimony. Whether the State's dramatic revocation attempt after the Elliot acquittal colored Junior's testimony *607 was a question for the jury to consider. See Breedlove v. State, 580 So.2d 605, 608 (Fla.1991) ("The constitutional right to confront one's accuser is meaningless if a person charged with wrongdoing is not afforded the opportunity to make a record from which he could argue to the jury that the evidence against him comes from witnesses whose credibility is suspect because they themselves may be subjected to criminal charges if they fail to `cooperate' with the authorities.") (quoting Morrell v. State, 297 So.2d 579, 580 (Fla. 1st DCA 1974)).
Acknowledging defense counsel's vigorous impeachment of Junior with prior inconsistent statements, I cannot agree with the majority's assertion that the probative value of this piece of evidence was substantially outweighed by the danger of unfair prejudice to the State. The revocation attempt imposed a new dynamic that went far beyond some mere memory problem. Without knowledge of the revocation proceedings, the jury could not consider whether Junior's recent recollections were merely the product of improved memory, or whether other motivating forces were at play. Accordingly, I find that the trial court should have admitted into evidence the revocation notice and relevant statements made by the State during the hearing on the revocation.[3]

B. The Elliot Verdict
Although I am unable to conclude that the trial court abused its discretion in excluding the Elliot acquittal, the appellant should have been afforded an opportunity to explain the temporal context of Junior's changed testimony. The trial court should have allowed inquiry to the extent reasonably necessary to show that context, without publishing the result of the Elliot trial. The trial court could have simply provided a limiting instruction "to avert any possible misunderstanding on the jury's part." Rease v. Anheuser-Busch, Inc., 644 So.2d 1383, 1387 n. 4 (Fla. 1st DCA 1994).

EN BANC JURISDICTION
I dissent vigorously to the majority's en banc review of this case. Perhaps to its credit, the majority has not even attempted to set out an adequate jurisdictional statement to support en banc consideration. Judge Ervin, on the other hand, has eloquently explained why this court does not have the authority to violate the requirements of the Florida constitution and statutes directing consideration of cases by three-judge panels of the district courts of appeal. See Art. V, § 4(a), Fla. Const.; § 35.13, Fla. Stat. (2004).
If one looks only at the facts and applicable law in this case, no matter of exceptional importance can be divined. The courts of this State routinely reverse trial judges for limiting cross-examination, particularly on issues of bias or interest. In a typical exposition of this principle, the Second District stated:
Bias or prejudice of a witness has an important bearing on his credibility and *608 evidence showing such bias is relevant. Webb v. State, 336 So.2d 416 (Fla.App.2d DCA 1976). It is proper to elicit facts tending to show bias or prejudice of a witness in cross-examination of that witness. Davis v. Ivey, 93 Fla. 387, 112 So. 264 (1927). This becomes an important right to a defendant in a criminal case where the jury must know of any improper motives of a prosecuting witness in determining that witness' credibility. See Roberts v. State, 164 So.2d 817 (Fla. 1964); Stewart v. State, 58 Fla. 97, 50 So. 642 (1909); Kirkland v. State, 185 So.2d 5 (Fla.App.2d DCA 1966); Stradtman v. State, 334 So.2d 100 (Fla.App.3d DCA 1976); Simmons v. Wainwright, 271 So.2d 464 (Fla.App. 1st DCA 1973). It is a fundamental principle that matters tending to show bias or prejudice in a criminal prosecution may be inquired about even when they were not mentioned in direct examination. Wallace v. State, 41 Fla. 547, 26 So. 713 (1899). Cf. Gard, Florida Evidence, P. 747 (1967); 81 Am.Jur.2d, Witnesses, Section 548.
McDuffie v. State, 341 So.2d 840, 841 (Fla. 2d DCA 1977). The Southern Reporter is literally crammed with Florida cases reversing criminal convictions because the trial court abused its discretion by limiting cross examination. As a mere digest, I offer the following:
 Murray v. State, 838 So.2d 1073, 1083-85 (Fla.2002) (finding the trial court erred in precluding cross-examination of State's expert witness as to conversation he had with defense's expert witness);
 Garcia v. State, 816 So.2d 554, 561-63 (Fla.2002) (finding the trial court erred in precluding the use of videotaped statements to impeach key State witness);
 Lewis v. State, 591 So.2d 922, 925-26 (Fla.1991) (answering certified question and finding the trial court erred in limiting cross-examination of sexual battery victim to preclude evidence of her sexual activities with a third-person; remanding to the district court for further proceedings);
 Baucham v. State, 881 So.2d 95, 97 (Fla. 1st DCA 2004) (finding the trial court erred in precluding cross-examination of police officers regarding defendant's complaints to police chief about the officers' performance before his arrest);
 Mouery v. State, 884 So.2d 1029, 1030 (Fla. 4th DCA 2004) (finding the trial court erred in not allowing appellant to cross-examine arresting officer as to statements appellant had made upon his arrest);
 Jackson v. State, 881 So.2d 711, 713 (Fla. 3d DCA 2004) (finding the trial court erred in refusing to allow appellant to impeach State witness with statements made during deposition);
 Mitchell v. State, 862 So.2d 908, 912 (Fla. 4th DCA 2003) (finding trial court's limitation of cross-examination improper because "the credibility of the defendant and the alleged victim, on the one hand, and one of the State's chief witnesses, on the other, were crucial to the case, any evidence tending to prove a motive to lie by the State's witness is both relevant and admissible");
 Stotler v. State, 834 So.2d 940, 943-44 (Fla. 4th DCA 2003) (finding the trial court erred in precluding appellant from cross-examining co-defendant as to conversations that occurred during a transaction shown on a videotape entered into evidence by the State);
 Hinojosa v. State, 857 So.2d 308, 310 (Fla. 2d DCA 2003) (finding the trial court erred in prohibiting cross-examination *609 of police officer regarding prior investigations into excessive use of force);
 Shaw v. State, 831 So.2d 772, 774 (Fla. 4th DCA 2002) (finding the trial court erred in excluding evidence of appellant's complaints against police officers for use of excessive force during his arrest);
 Barows v. State, 805 So.2d 120, 122 (Fla. 4th DCA 2002) (finding the trial court erred in prohibiting appellant from cross-examination of State witness regarding the witness' potential civil forfeiture of money "where such evidence was relevant to show bias or motive to lie");
 Davis v. State, 756 So.2d 205, 208 (Fla. 4th DCA 2000) (finding the trial court erred in precluding cross-examination of victim in regard to material omissions made during pretrial statements);
 Washington v. State, 737 So.2d 1208, 1219 (Fla. 1st DCA 1999) (finding the trial court erred in limiting cross-examination of the mother of an infant allegedly killed by appellant where proffered testimony was exculpatory in nature);
 Sanjurjo v. State, 736 So.2d 1263, 1264 (Fla. 4th DCA 1999) (finding the trial court erred in precluding cross-examination regarding omissions made by the State's witness during previous statements);
 Purcell v. State, 735 So.2d 579, 581 (Fla. 4th DCA 1999) (finding the trial court erred in not allowing appellant to ask whether the State's witness previously offered to "let the case go away" in exchange for money);
 McBean v. State, 688 So.2d 383, 385 (Fla. 4th DCA 1997) (finding the trial court erred in not allowing cross-examination of State witness with regard to omission made in pretrial statements);
 Chadwick v. State, 680 So.2d 567, 568 (Fla. 1st DCA 1996) (finding the trial court erred in excluding evidence of appellant's threatened lawsuit and internal investigation regarding police abuse arising after appellant's arrest);
 Livingston v. State, 678 So.2d 895, 898 (Fla. 4th DCA 1996) (finding the trial court erred in precluding cross-examination connecting the disposition of key witness' criminal case with his testimony in appellant's case).
The extremely fact-specific nature of this case is demonstrated most graphically by the majority per curiam opinion and by Judge Thomas' special concurring opinion. The majority applies the familiar rule of section 90.403, Florida Statutes, and simply reaches a different result than the one I believe is correct. Judge Thomas goes beyond the per curiam opinion and, after enumerating the details of Junior's testimony, concludes that the error here was harmless. Although the definition of harmless error might well be a basis for en banc jurisdiction, the determination that a particular error was harmless is, by its very nature, one of the most highly case-specific determinations made by an appeals court.

CONCLUSION
A majority of this fifteen-judge court has decided, for a variety of reasons, that appellant's conviction should be affirmed. In doing so, they have, regretfully in my view, paid little heed to the applicable constitutional and statutory provisions. They have also not honored the rule of appellate procedure establishing the very limited exception to the requirement of a three-judge panel: "En banc hearings and rehearing *610 shall not be ordered unless the case is of exceptional importance or unless necessary to maintain uniformity in the court's decisions." Fla. R.App. P. 9.331(a). In adopting this rule, our supreme court could have hardly chosen a stronger modifier than "exceptional." This means more than merely out of the ordinary, more than merely significant, and certainly more than disagreeable in the estimation of other members of the appellate court.
Whether our supreme court will determine in the future that it has jurisdiction to review this en banc decision is clearly beyond my ken. Nevertheless, if there were ever a case in which the supreme court should take upon itself to limit the jurisdictional boundaries of en banc consideration, this is the case. In fact, and perhaps ironically, the only matter of exceptional importance in this entire case is whether en banc jurisdiction exists at all.
ERVIN, J., concurring and dissenting.
On the merits, I concur with and dissent from the majority's opinion for the same reasons expressed by Chief Judge Kahn in his separate opinion. This opinion addresses only the issue of the court's en banc review of the instant case. In my judgment, before reaching its decision on the merits, the majority was first required by Florida Rule of Appellate Procedure 9.331 to hurdle the substantial en banc obstacle demanding that the case be either one of maintaining uniformity in the court's decisions, or of exceptional importance. Because the reason for the court's exercise of such jurisdiction is not explicitly stated by the majority, and its opinion fails to inform the reader of any decisional conflict in the court's decisions, I can only conclude the majority deems this case worthy of en banc consideration on the ground of exceptional importance. If this is in fact the basis for its review, I strongly dissent. The majority's opinion makes no attempt whatsoever to explain why, in an appeal in which it acknowledges our review standard over a trial court's ruling to exclude or admit evidence is abuse of discretion, the application of the balancing test somehow transforms this highly specific fact-based case into one worthy of en banc consideration. In my judgment, rule 9.331 was simply not designed for such purpose.
Since the inception of the district courts of appeal in 1957, cases have been routinely decided by three-judge panels. Art. V, § 4(a), Fla. Const. In 1980, the district courts were first conferred authority by Florida Rule of Appellate Procedure 9.331 to proceed en banc on the ground of the maintenance of uniformity in the court's decisions, In re: Fla. Rules of Appellate Procedure, 374 So.2d 992 (Fla.1979), and, in 1985, they were given the power of en banc review on the basis of exceptional importance. The Fla. Bar re: Rules of Appellate Procedure, 463 So.2d 1114 (Fla. 1984). Because the constitutional provision places decision-making authority in three-judge panels, I consider it reasonably clear that the supreme court intended that full-court review should be scrupulously limited to the two narrow classes of cases specified in the rule.
Based on my review, it appears that a district court of appeal's right to consider a case en banc must be considered a jurisdictional power, notwithstanding that its authority in such respect is derived solely from the rule, and despite the well recognized principle that a court's subject-matter jurisdiction is given it by substantive law, i.e., by either the Florida Constitution or by statute. Paulucci v. Gen. Dynamics Corp., 842 So.2d 797 (Fla.2003); Chase Bank of Texas Nat'l Ass'n v. Dep't of Ins., 860 So.2d 472 (Fla. 1st DCA 2003). Despite the absence of any statutory or constitutional provision creating in the district *611 courts the power to proceed en banc, I regard the appellate courts' authority to so act as a substantive power, and, as such, part of their subject-matter jurisdiction.
My conclusion is evident from a reading of the language of the rule itself, which includes both substantive and procedural elements. It is procedural because it prescribes the method by which the substantive right of conducting an en banc proceeding may be enforced. See In re: Fla. Rules of Criminal Procedure, 272 So.2d 65 (Fla.1972) (Adkins, J., concurring). It is substantive because it confers on the district courts sitting en banc the power to decide two narrowly limited classes of cases. The supreme court has explained the distinction between substance and procedure in the following terms:
Substantive law prescribes the duties and rights under our system of government. The responsibility to make substantive law is in the legislature within the limits of the state and federal constitutions. Procedural law concerns the means and method to apply and enforce those duties and rights. Procedural rules concerning the judicial branch are the responsibility of this Court, subject to repeal by the legislature in accordance with our constitutional provisions.
Benyard v. Wainwright, 322 So.2d 473, 475 (Fla.1975).
Power has traditionally been understood as a characteristic of jurisdiction, which is defined as "a court's power to decide a case or issue a decree," or "the power of a[n appellate] court to review and revise a lower court's decision." BLACK'S LAW DICTIONARY 867, 868 (8th ed.2004). In fact, a number of opinions of the district courts of appeal describe the invocation of the en banc process as one of "en banc jurisdiction." See Wright v. Wright, 509 So.2d 329, 330 (Fla. 3d DCA 1987) (on reh'g en banc); State v. Navarro, 464 So.2d 137 (Fla. 3d DCA 1984). Indeed, the Florida Supreme Court has itself intimated that the exercise of a district court's authority to proceed en banc is jurisdictional. In Chase Federal Savings & Loan Association v. Schreiber, 479 So.2d 90, 93 (Fla. 1985), the court noted the United States Supreme Court had held in Western Pacific Railroad Corp. v. Western Pacific Railroad Co., 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953), that the en banc process was an expression of the court's power rather than a party's right.
A final reason why an appellate court's authority to proceed en banc must be considered jurisdictional is evident from an examination of the characteristics of such authority. The two classes of cases necessary for a district court's invocation of the en banc process correspond roughly with two of the groups of cases expressly placed under the supreme court's jurisdictional powers of review: Decisions of the district courts of appeal that certify questions of great public importance, and those certified as being in direct conflict with decisions of other district courts. Art. V, § 3(b)(4), Fla. Const.
Thus, notwithstanding the lack of any language in rule 9.331 expressly referring to a district court's jurisdiction to conduct en banc proceedings, I believe it is abundantly clear that the rule's delegation of authority of the two specified categories of cases to the district courts of appeal must be deemed primarily a jurisdictional grant of power.[4]
*612 I now turn to the heart of this dissent, pertaining to the invocation of en banc jurisdiction in the present case by a majority of the members of this court on what appears to be the ground of exceptional importance, which, I maintain, simply does not exist. Unfortunately, rule 9.331 does not provide any definition of the term "exceptional importance." Nevertheless, I assume, just as the district courts of appeal are free to adopt their own concept of decisional uniformity, see Committee Notes to Rule 9.331, they are similarly free to develop their own definition of exceptional importance. Despite, however, the addition of the exceptional importance standard to the rule more than 20 years ago, this court has never established any criteria for the exercise of its en banc jurisdiction on such ground, notwithstanding that we have proceeded en banc on such basis no fewer than five occasions. See Brooks v. State, 816 So.2d 199 (Fla. 1st DCA 2002) (entitlement of defendant to belated appeal); Morris v. State, 789 So.2d 1032 (Fla. 1st DCA 2001) (sufficiency of verbal conduct to support conviction for lewd and lascivious act); In Interest of D.J.S., 563 So.2d 655 (Fla. 1st DCA 1990) (clear and convincing evidence supporting order terminating parental rights); State v. Diamond, 553 So.2d 1185 (Fla. 1st DCA 1988) (propriety of trial court order directing child sexual battery witnesses to submit to physical examination); Marr v. State, 470 So.2d 703 (Fla. 1st DCA 1985) (on reh'g en banc) (giving of requested jury instruction that the testimony of the prosecutrix in a case involving sexual battery be rigidly scrutinized). I do not mean to imply that the issues in the above cases did not necessarily fall within the category of exceptional importance, only that the court's opinions failed to explain why the particular appeal was deserving of such extraordinary treatment, with the result that the reader was required to examine the facts and issues in each case  as in the instant case  to determine how the full court arrived at its decision to proceed en banc.
Criteria for deciding whether a particular case is worthy of en banc consideration on such ground do, however, exist. The two expressed bases in rule 9.331 authorizing a district court to review a case en banc also appear in Federal Rule of Appellate Procedure 35. We have been advised that the rule was initially patterned after the en banc rule of the United States Court of Appeals for the Fifth and Eleventh Circuits. See Comm. Note to Fla. R.App. P. 9.331, Comm. N. to 1982 Amends. It has long been recognized that if a state rule is modeled on the language of its federal counterpart, the rule will take the same construction in Florida courts as its prototype has been given, insofar as such construction comports with the spirit and policy of the Florida law relating to the same subject. Pasco County Sch. Bd. v. Fla. Pub. Employees Relations Comm'n, 353 So.2d 108, 116 (Fla. 1st DCA 1977). In the federal sector, the following guidelines have been established:
The federal cases instruct that only the "truly extraordinary cases" merit en banc treatment, Boraas v. Village of Belle Terre, 476 F.2d 806, 829 (2d Cir. 1973) (statement of Mansfield, J.). Such cases involve "issue[s] likely to affect *613 many other cases " issues of real significance to the legal process as well as to the litigants. Walters v. Moore-McCormack Lines, Inc., 312 F.2d 893, 894 (2d Cir.1963) (statement of Lumbard, C.J.) (emphasis supplied). See also Gilliard v. Oswald, 557 F.2d 359 (2d Cir.1977) (statement of Kaufman, C.J.); United States v. Rosciano, 499 F.2d 173, 174 (7th Cir.1974) (en banc). Moreover, rule 35 may not be used "`merely' to correct individual injustices or mistakes". Galella v. Onassis, 487 F.2d 986, 1005 (dissenting opinion), quoting Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1021-1022 (2d Cir.1973) (dissenting opinion).
Marr v. State, 470 So.2d 703, 716 (Fla. 1st DCA 1985) (on reh'g en banc) (Ervin, J., dissenting).
It is readily clear from a reading of the majority's opinion that the arguments on the merits in the instant case can hardly be said to comport with any of the criteria that have developed in the federal courts system. The highly specific facts in the case at bar, relating to the issue of the lower court's exclusion from evidence the state's attempted notice of revocation of witness Junior's plea bargain agreement, is obviously not a question likely to affect many other cases. Moreover, if the issue turns on whether the lower court's ruling, if error, was only harmless, as Judge Thomas posits in his concurring opinion, I strongly question that such issue falls into the category of exceptional importance requiring the attention of all members of the court to correct what the majority deems to be a mistake in the panel's decision. If disagreement by non-panel members with a panel's decision that refused to apply harmless error is an appropriate criterion for deciding whether an individual case should be considered suitable for en banc consideration on the ground of exceptional importance, I could conceive of countless numbers of this court's cases that would be fair game for such review.[5]
The following statement by Chief Judge Kaufman in Gilliard v. Oswald, 557 F.2d 359 (2d Cir.1977), is as applicable to Florida's appellate courts as it was and remains applicable to the federal judiciary:
The future effectiveness of the overburdened federal courts depends in large measure upon wise allocation of judicial energy. Extension of the en banc rehearing procedure in an era of increasingly congested dockets is an extravagance we simply cannot afford. F.R.A.P. 35 instructs that the en banc mechanism is "not favored" and strictly limits its use to cases of "extraordinary importance" or to resolve a clear and direct conflict between the decisions of different panels of the court. In practice en bancs are time-consuming and cumbersome, and only rarely produce dispositive resolution of major, recurring issues. The proliferation of opinions which is not rare in an en banc decision, usually obfuscates rather than clarifies. Ordinarily, I do not believe a judge should cast a vote for reconsideration by the entire court merely because he disagrees with the result reached by the panel. As I have indicated, Rule 35 was not adopted to provide that luxury.
Judge Kaufman's observations of the inordinate amount of time generally involved in the disposition of an en banc appeal are highly applicable to the instant case, which was orally argued in November 2004, and *614 has since been the subject of a proposed majority panel opinion affirming and reversing in part, a panel dissent, a request for en banc, responses thereto by all members of the court, a conference of the full court, a majority en banc opinion, and this and other dissenting and concurring opinions. The resulting delay is clearly at odds with the expressed instruction that criminal cases be given preference over civil cases. Fla. R. Jud. Admin. 2.052(a)(3).
By failing to establish any clearly defined standards for the exercise of this court's en banc jurisdiction, we operate essentially as a two-tier appellate tribunal, with the full court assuming a supervisory role over panel decisions with which it disagrees. Thus, on the same record the panel determined the lower court had abused its discretion in refusing to admit into evidence the state's attempt to revoke a bargained agreement of a material witness, this court, acting in its en banc capacity, decides, without any display of extraordinary circumstances, no abuse occurred. Because the power to resolve such issues has been constitutionally delegated to three-judge panels, I respectfully, but emphatically, dissent.
WOLF, J., Concurring and Dissenting.
I concur with the decisions of the court to affirm the conviction and to uphold restitution in favor of the county. I dissent, however, from the decision to go en banc for substantially the same reasons expressed by Judge Kahn and Judge Ervin.
I also feel that I must address two matters raised by Judge Allen's concurrence. I challenge the implication that the restitution issue had anything to do with the vote of the court to go en banc. I suggest, rather, that it is an attempted after-the-fact justification for a decision which otherwise cannot be justified.[6]
I am also concerned with the statement that "involvement of a particular party" might justify exercise of the court's en banc jurisdiction. If this statement implies that the name of a particular person involved in the case affects the quantum of consideration and scrutiny available in a particular case, I strongly disagree.[7] A party is entitled to the same consideration from this court whether his name is Childers or Smith. To do otherwise would place more importance on personalities than equal application of the rule of law.
WEBSTER, J., concurring in part and dissenting in part.
I concur with those of my colleagues who argue that this case does not present a question of "great public importance" so as to justify en banc consideration and, therefore, dissent from the majority opinion to that extent. On the merits of the issues decided, however, I concur fully with the majority.
BENTON, J., concurring in part and dissenting in part.
In my view, the trial judge did an exemplary job in this case, and his rulings were correct in every respect in which they have been challenged. I concur in the judgment of the court to the extent it affirms the conviction, but I dissent insofar as the *615 court today overturns the trial court's decision under the restitution statute.
As a witness, the late Mr. Junior was properly subject to cross-examination, not only as to facts relevant to the allegations laid out in the information, but also as to facts relevant to interest, animus, or any other type of bias that might have led him to testify falsely against Mr. Childers. See § 90.608(2), Fla. Stat. (2002) ("Any party... may attack the credibility of a witness by . . . (2) Showing that the witness is biased."). Entirely appropriately, Mr. Junior was also cross-examined at length about prior inconsistent statements he had made. See § 90.608(1), Fla. Stat. (2002) ("Any party . . . may attack the credibility of a witness by ... (1) Introducing statements of the witness which are inconsistent with the witness's present testimony.").
Cross-examination is at once an important incentive for, and the adversary system's great engine for testing for, truthful testimony. Eschewing the rack and screw, we count on cross-examination. . . to ferret out the truth from any and all witnesses, and to gain a fuller understanding of the import of their testimony. See Sanders v. State, 707 So.2d 664, 667 (Fla.1998) ("[L]imiting cross-examination in a manner that precludes relevant and important facts bearing on the trustworthiness of testimony constitutes error, especially when the cross-examination is directed at a witness for the prosecution."). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).
Bordelon v. State, 908 So.2d 543, 545-46 (Fla. 1st DCA 2005). But cross-examination must be relevant either to the issues being tried or to "the trustworthiness of testimony." 707 So.2d at 667. Subsidiary procedural developments in the late Mr. Junior's own case were irrelevant under either test. What was relevant and impeaching was the "big picture": the pendency of proceedings that must have seemed to Mr. Junior to put his fate in the hands of the prosecutors; and the lengthy sentences his plea bargain, conditioned on testifying "truthfully" in the Childers trial, were meant to avoid. About these matters, the jurors were well and repeatedly informed.
The tangential result of a third prosecution, the filing of the much ballyhooed "`Notice of Revocation of Terms of Plea Agreement,' in Junior's criminal case," Majority Op. at 589, "and certain statements made by the State during the revocation hearing," Separate Op., of Ch. J. Kahn at 604, were altogether irrelevant, not only in the main Childers case, but also as impeachment. Their proffer below was, moreover, disingenuous, if not actually withdrawn when the trial judge made clear that the rule of completeness would also have required admission of the trial court's contemporaneous ruling on the whole matter, denying revocation of the plea bargain in the Junior case. It could not have been lost on defense counsel that informing the jury of an official determination that Mr. Junior had not breached his plea bargain but had testified truthfully in the third trial would have bolstered, not undermined, Mr. Junior's credibility.
Both the Notice of Revocation of Terms of Plea Agreement and the complained of statements made by the State were, at bottom, expressions of opinions by those prosecuting the case. See R. Regulating Fla. Bar 4-3.4(e) ("A lawyer shall not:. . . . (e) in trial, ... state a personal opinion as to . . . the credibility of a witness."). It is unethical for a lawyer to assert a personal opinion regarding the credibility *616 of a witness. See Ruiz v. State, 743 So.2d 1, 4 (Fla.1999) ("[An attorney] may not express his personal opinion on ... the credibility of witnesses.") (quoting United States v. Garza, 608 F.2d 659, 663 (5th Cir.1979)); Kelly v. State, 842 So.2d 223, 227 (Fla. 1st DCA 2003); see also Lingle v. Dion, 776 So.2d 1073, 1078 (Fla. 4th DCA 2001) ("An attorney's expression of his personal opinion as to the credibility of a witness ... is entirely improper."). For this reason, too, the trial court did not err in excluding the Notice and attendant statements.
As for whether the government or a subdivision thereof is a "person," § 1.01(3), Fla. Stat. (2002), within the meaning of the definition of "victim," § 775.089(1)(c), Fla. Stat. (2002), in a penal statute, fidelity to the rule of lenity can lead only to the conclusion that the learned trial judge reached. See § 775.021(1), Fla. Stat. (2002) (requiring that "when the language [of a penal statute] is susceptible of differing constructions, it shall be construed most favorably to the accused"). Under accepted principles, Escambia County cannot be a "victim" within the meaning of section 775.089(1)(c), Florida Statutes (2002).
The majority opinion fails to acknowledge that the language it (selectively) quotes from section 960.295(2) can be fully explained by antecedent provisions that, while they render convicts financially liable to the state, do not authorize restitution awards under section 775.089(1)(c), Florida Statutes (2002). See § 960.293(2), Fla. Stat. (2002) ("Upon conviction, a convicted offender is liable to the state and its local subdivisions for damages and losses for incarceration costs and other correctional costs."). The majority opinion mistakenly relies on section 960.295, Florida Statutes (2002) ("Civil restitution lien supplemental to other forms of restitution available to lienholder."), misapplies civil precedent in a penal context, and dishonors the rule of lenity. See Lewis v. State, 874 So.2d 18, 20 (Fla. 4th DCA 2004) (reversing the order of restitution "[b]ecause the sheriff's office does not meet the statutory definition of `victim'"); Jones v. State, 846 So.2d 662, 662-63 (Fla. 2d DCA 2003) (same); Sheppard v. State, 753 So.2d 748, 748 (Fla. 2d DCA 2000) ("The Division of Insurance Fraud is not a "victim" in this case and cannot receive restitution."); Sims v. State, 746 So.2d 546, 547 (Fla. 2d DCA 1999) ("The State does not qualify as a victim for payment of restitution pursuant to section 775.089(1)(c), Florida Statutes (1997).").
Accordingly, I dissent from the judgment of the court insofar as it overrules the trial court as to restitution, but concur in the judgment otherwise.
BROWNING, J., concurring in part and dissenting in part.
I concur with the majority that this case presents a question of "great public importance" that justifies its en banc consideration; however, I concur fully with Chief Judge Kahn's opinion on the merits of the issues, as the majority opinion unduly restricts the Appellant's right of cross-examination contrary to a host of controlling cases, and violates Appellant's constitutional rights to confront his accuser, to trial by jury, and to due process of law. (Such cases are cited and Appellant's constitutional rights are fully and fairly discussed in other opinions, and in the interest of brevity, I refrain from further discussion of such issues.)
POLSTON, J., concurring in part, dissenting in part.
I concur with Chief Judge Kahn's opinion on the merits. The primary evidence against Childers comes from a government *617 witness, Junior, who had a deal with the government, but the procedural safeguard of a complete and full cross-examination of Junior was not permitted. The State's attempted revocation of their plea agreement was a significant "slap-over-the-head attention-grabber" to Junior, even though it was denied by the trial court. Junior's view of the State's action and its effect on the status of their deal, including how he needed to perform under the agreement to ensure the State did not attempt another revocation, should have been allowed as evidence of Junior's bias. See United States v. Abel, 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (stating that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony"). Therefore, Childers' Sixth Amendment Confrontation Rights under the United States Constitution were violated. See Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (stating that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination").
A witness testifying on behalf of the state because he has a deal with the state obviously may be biased.[8] Nevertheless, such testimony is allowed and is extensively used in our criminal justice system because we trust juries to sort out the facts and evaluate the witness' credibility through the aid of comprehensive cross-examination.[9] What the witness thinks *618 about the deal, the terms of the deal, how it came about, and the witness' understanding of how the parties have performed, or will perform, under the deal, and possible implications of such performance, all affect the potential bias of the witness and are therefore subject to cross-examination.[10]
"A successful showing of bias on the part of a witness would have tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." Abel, 469 U.S. at 51, 105 S.Ct. 465. The State's willingness to withdraw their agreement based on the content of Junior's testimony was demonstrated through their attempted revocation. Therefore, the State's actions made the existence of Junior's bias more probable, and more relevant to support that inference. Id. at 52, 105 S.Ct. 465 (stating, "[b]ias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest").
The actions of the witness and the government in relation to an established deal, as has been stated in the cases cited above, are relevant and may be probed on cross-examination, even where the cross-examination raises otherwise inadmissible evidence. See United States v. Lynn, 856 F.2d 430, 432-34 (1st Cir.1988). In Lynn, the court held that the fact that neither government witness testifying under a plea agreement had successfully passed his polygraph test as his agreement required was relevant and could be probed on cross-examination. The court explained that the fact that the witnesses had not passed their polygraph exams, and thus had not successfully completed the terms of their plea agreements, could show that the witnesses had reason to continue to testify favorably to the government "in return for future prosecutorial favors." Id. at 433. While the scope of cross-examination was within the trial court's discretion, the court stated, "[t]hat discretion ... `becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant.'" Id.; see also Mayer, 556 F.2d at 250. In Lynn, that threshold had not been met because the trial court "foreclosed [a] topic [that] may have presented the only concrete example of the hold the government might still have had over the witness." 856 F.2d at 433.
In the instant case, "the constitutionally required threshold level of inquiry [to be] afforded the defendant" was not met because *619 the trial court "foreclosed [a] topic [that] may have presented the only concrete example of the hold the government might still have had over the witness." Lynn, 856 F.2d at 433. The State's attempted revocation of Junior's plea agreement could have worked as a "slap-over-the-head attention-grabber," despite the fact that the trial court denied it. This evidence could show that Junior had reason to continue to testify favorably to the government "in return for future prosecutorial favors." Id. For instance, Junior could have hoped that if he testified favorably for the State, the State would not again attempt to revoke his plea agreement, and that if he did not, another revocation may be sought by the State. It was, therefore, important to a fair trial that appellant have the opportunity to engage in vigorous and searching cross-examination and present all of the facts bearing on Junior's credibility, including the actions of prosecutors in relation to the witness' plea agreement. See e.g. Mayer, 556 F.2d at 248-49; Lee, 506 F.2d at 117.
NOTES
[1] As can be seen, in this case the judges of this court have differing views on the question of en banc consideration and the issues raised on the merits. Some judges concur with en banc consideration but dissent on the merits, while other judges dissent on en banc consideration but concur on the merits. Accordingly, in this opinion we address only the issues relating to the merits of the instant action.
[2] Because I would reverse the conviction, I do not reach the question of restitution raised by the State on cross-appeal. Although I agree with much of the sentiment expressed in the majority opinion, that opinion creates direct conflict by its interpretation of section 775.089, Florida Statutes (2002). See, e.g., Lewis v. State, 874 So.2d at 18, 20 (Fla. 4th DCA 2004) (finding that "the sheriff's office does not meet the statutory definition of `victim'"); Jones v. State, 846 So.2d at 662-63 (Fla. 2d DCA 2003) (same); Sheppard v. State, 753 So.2d 748, 748 (Fla. 2d DCA 2000) ("The Division of Insurance Fraud is not a `victim' in this case and cannot receive restitution."); Sims v. State, 746 So.2d 546, 547 (Fla. 2d DCA 1999) ("The State does not qualify as a victim for payment of restitution....").
[3] The statements made by the State during the revocation hearing are also admissible as opposing party admissions. See United States v. Morgan, 581 F.2d 933, 937 n. 10 (D.C.Cir. 1978)("[T]he Federal Rules [of Evidence] clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases, and specifically provide in certain circumstances statements made by government agents are admissible against the government as substantive evidence."); State v. Worthen, 765 P.2d 839, 847-48 (Utah 1988)("The prosecutor can hardly be considered a disinterested party or his statements any less an admission on the State's part than the statements of any other attorney."); Allen v. State, 787 N.E.2d 473, 479 (Ind.App. 2003)("As we have already found that the Indiana rule on party-opponent statements applies against the government in civil cases, we see no reason why it should not apply in criminal cases.").
[4] In so concluding, I assume that the supreme court's adoption of rule 9.331 was an appropriate exercise of its power to adopt rules of practice and procedure, conferred to it by Article V, section 2(a) of the Florida Constitution, because the procedural provisions of the rule may be said to be intimately intertwined with the creation of substantive rights. See Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 54 (Fla.2000). This is, however, an issue that has never been directly addressed. I do note that in adopting the rule, the court approved the Appellate Structure Commission's recommendation that the constitutional limitation placing decision-making authority in three-judge panels sets only a minimum standard and does not prohibit district courts from sitting en banc. See In re: Fla. Rules of Appellate Procedure, 374 So.2d at 993.
[5] For example, since the supreme court established its harmless beyond a reasonable doubt review standard in State v. DiGuilio, 491 So.2d 1129 (Fla.1986), this court has applied that standard in over 100 written opinions, and a substantial number of them have rejected the state's harmless error argument.
[6] While I agree with the result reached by the majority on the restitution issue, I question its overall importance in light of how rarely a local government is a victim and because this is an issue which can easily be remedied by the Legislature.
[7] If this statement is intended to convey the message that there may be an important issue affecting the duties of a person who holds a particular office and rising to the level of exceptional importance, I do not argue with this concept.
[8] See United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir.1987) ("No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence. It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence, but courts uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility.").
[9] See United States v. Abel, 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (stating that the Confrontation Clause of the Sixth Amendment requires a defendant to have an opportunity to show bias on the part of a prosecution witness, citing Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)); Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (ruling that even though the government informer may have had more motives to lie than most other informers, it does not follow that his testimony was constitutionally inadmissible; "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury"); On Lee v. United States, 343 U.S. 747, 757, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) (the "use of informers, accessories, accomplices, false friends, or any of the other betrayals which are `dirty business' may raise serious questions of credibility .... a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions"); United States v. Barnett, 197 F.3d 138, 144 (5th Cir. 1999) ("[w]e have opted to protect the judicial process from the stain of perjury with other safeguards, including the prohibition on the use of perjured testimony, the requirement that the government disclose such arrangements, the opportunity for defense counsel to engage in rigorous cross-examination, and the instruction of the jury on the suspect nature of compensated testimony"); United States v. Dailey, 759 F.2d 192, 200 (1st Cir.1985) (stating that government witnesses should be allowed to testify under a plea agreement with procedural safeguards in place, including that "[t]he agreements should be read to the jury and made available during its deliberations" and "defense counsel may cross-examine the accomplices at length about the agreements"); United States v. Lee, 506 F.2d 111, 117 (D.C.Cir.1974) (stating that "[t]he availability of vigorous cross-examination is significant context for validating the use and testimony of accomplices and secret informers as a necessary means of coping with covert criminality").
[10] See e.g. Leavine v. State, 109 Fla. 447, 147 So. 897, 902-03 (1933) (concluding that had the issue been properly preserved, it would have been error for the trial court to limit cross-examination of a state witness as to his hopes for leniency when he testified previously for the State); Holt v. State, 378 So.2d 106, 107-08 (Fla. 5th DCA 1980) (stating, "[a]ny evidence which tends to establish that a witness is appearing for the State for any reason other than merely to tell the truth should not be kept from the jury," including the details surrounding a grant of immunity); United States v. Mayer, 556 F.2d 245, 248-49 (5th Cir.1977) (stating that "cross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope... [t]his is especially true where a prosecution witness has had prior dealings with the prosecution or with other law enforcement officials, so that the possibility exists that his testimony was motivated by a desire to please the prosecution in exchange for the prosecutor's actions in having some or all of the charges against the witness dropped, securing immunity against prosecution for the witness, or attempting to assure that the witness receives lenient treatment in sentencing") (citations omitted); United States v. Masino, 275 F.2d 129, 132 (2d Cir.1960) (stating that "it was relevant for the defense to develop any facts bearing upon [the witness'] possible motives to falsify his testimony").